484 So.2d 771 (1986)
Betty Raye PACE
v.
Dr. Ezeckiel ZILKA, et al.
No. 84CA1241.
Court of Appeal of Louisiana, First Circuit.
February 25, 1986.
Rehearing Denied March 31, 1986.
Writ Denied May 16, 1986.
Harry L. Shoemaker, III, Baton Rouge, A. Foster Sanders, Baton Rouge, for plaintiff-appellant Betty Raye Pace.
Daniel R. Atkinson, Baton Rouge, for defendant-appellee U.S. Surgical Corp.
Brent E. Kinchen, Baton Rouge, for defendant-appellee HCA Health Services of Louisiana, Inc. d/b/a Doctors Memorial Hosp.
Before GROVER L. COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
Following complications and remedial surgery after a gastric partition operation (laparotomy), Betty Raye Pace (plaintiff) brought this medical malpractice and products liability action against Dr. Ezeckiel Zilka; Dr. Mike O'Brian; HCA Health Services of Louisiana, Inc. d/b/a Doctors Memorial Hospital (Doctors); Auto Suture Company, Division of United States Surgical Corporation (Auto Suture) and United States Surgical Corporation (U.S. Surgical) (defendants). A motion for summary judgment by U.S. Surgical and Doctors was granted dismissing them from this litigation. After denial of her motion for a new trial, plaintiff has appealed to this court.
Plaintiff sought treatment from Dr. Zilka for weight loss and problems from a prior bowel bypass performed by another doctor several years earlier. On January 8, 1980, *772 Dr. Zilka reconstructed plaintiff's bowel bypass to its original condition and performed the first laparotomy, which was successful for about six months.
Dr. Zilka did a second laparotomy on March 26, 1982, at Doctors which revealed that the staples from the first laparotomy had separated. Dr. Zilka attempted to use the Mason procedure to reduce the stomach capacity to between one and two ounces, by creating a pouch and funneling food through a surgically created small "tunnel" or narrow channel. This procedure required the combined use of two stapling devices, and EEA and a TA90, manufactured by U.S. Surgical and owned by Doctors. The EEA is used to create a hole so the TA90 can be inserted behind the stomach. Firing the TA90 creates a stainless steel staple line which closes the back to the front wall of the stomach, forming a small pouch. A nasogastric tube is inserted during surgery to drain the stomach to avoid stretching and separating the staple line.
All of the parties agree that the EEA did not work and that the doctor had to hand suture the area that should have been stapled by the EEA. The doctor's operative note shows that insertion of methylene blue solution through the nasogastric tube revealed a small leak "close to the created gastric defect." Dr. Zilka put extra sutures to control it, found no further leaks, and insisted that this leak was not the same or in the same area as the crucial gastric leak at issue here. In his deposition, Dr. Zilka said that this first leak was "at the cut end ... where we cut it ... at the edge ..." and the gastric leak at issue "was not at the edge." An operative note written after the remedial surgery on March 30, 1982, located this leak "close to the staple line at the proximal part of the tunnel that was created previously," that is, in the tunnel or pocket created surgically in the March 26 operation.
Plaintiff sued in tort and products liability based upon the failure of the EEA during surgery, its alleged cause of the gastric leak which necessitated the corrective surgery, unknown acts performed upon her while she was under the control of the doctors and the hospital (based upon res ipsa loquitur) and delay and failure of the duty to monitor and care for her, with resulting severe symptoms and near death.
In answers to defendants' interrogatories, plaintiff stated:
On Friday [March 26] after I came out of surgery, I begged him to take me to X-ray because bile was coming up in my throat. He said I was just scared because I had worked in a hospital, that there was nothing wrong. On Monday, I was swollen and they took me in to X-ray. I asked Dr. Zilka to tell me what it was and he said It's what I though[t] and he would have to take me back into surgery.
She also stated that he should have taken x-rays sooner and that "he stated that a staple fell during surgery causing a puncture to my bowel. He was also negligent in delaying corrective treatment for my serious disorders following surgery."
Dr. Zilka testified in his deposition that, to the contrary, plaintiff's postoperative problems began about 36 hours after the March 26 surgery with symptoms of shortness of breath, low oxygen in the blood, possible pulmonary embolus, infection or gastric leak, high white count of 13,000, temperature, and incisional tenderness; and that he transferred her to the Intensive Care Unit for close monitoring, administration of oxygen, blood thinner and antibiotics. The test for gastric leak was performed on March 30, with remedial surgery the same day.
Dr. Zilka's deposition shows that while he had no medical evidence of a gastric leak, he had intuitively suspected one; that during corrective surgery, performed roughly 48 hours after symptoms appeared, he found a small three-millimeter (1/8 inch) hole close to the staple line "in that tunnel"; that there are increased risks whenever re-operation occurs in the abdomen; that he had warned plaintiff of possible complications of peritonitis, wound dehiscence, infection, and failure of the laparotomy *773 all involving either infection and/or opening or separation of the wound; that the cause of the gastric leak could not be determined definitely, but he speculated it was the placement of the nasogastric tube; that it was not the staple line which failed; that he and the nurses checked the EEA before surgery; that there was no way to check the disposable cartridge since checking it fires the staples, leaving you without any for surgery; that the EEA merely expedited the surgery; that hand sewing did not take much more time than using the EEA and was as reliable, although subject to individual stitch variance unlike the EEA; that he did not see that the EEA could have fired a few staples which he had failed to find; that although this was the first time he had used the EEA at Doctors, he had used this particular stapler about two dozen times before; that he considered the surgery successful since the mortality rate from gastric leaks is over 50%; and that although normal recovery took about one week, plaintiff was discharged on April 28, 1982 (about one month later).
Summary judgments are sparingly granted, only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." LSA-C.C.P. art. 966. In determining the genuineness of the issue, the courts cannot consider the case on its merits, determine witness credibility, or prejudge the ultimate outcome of the factual determination. Fly v. Hand, 376 So.2d 1016, 1020 (La.App. 1st Cir.1979). Since the mover for a summary judgment bears the burden of establishing that no factual issue exists, inferences to be drawn from underlying facts in the materials before the court must be viewed in the light most favorable to the opposing party, with indulgent treatment of his papers and close scrutiny of those of the mover. Vermilion Corporation v. Vaughn, 397 So.2d 490, 493 (La.1981).
Defendants' contention that plaintiff must present affidavits and other evidence to establish her allegations of negligence and the cause-in-fact for the necessity of corrective surgery is unfounded. The court must first decide whether the party moving for a summary judgment has supporting evidence sufficient to resolve all genuine issues of material fact. If insufficient, the motion for summary judgment must be denied. Tipton v. Lewis, 403 So.2d 806, 809 (La.App. 2nd Cir.1981).
Plaintiff says that the doctor blamed the gastric leak on a staple. The defendants deny that the failure of the EEA stapler is the cause of the postoperative problems and corrective surgery. This, by itself, creates a genuine issue as to material fact.
The judgment is reversed, and the case is remanded for trial on the merits. The costs of this appeal are taxed to defendants. All other costs are to await final determination of the case.
REVERSED AND REMANDED.