626 So.2d 345 (1993)
Martha E. SASSONE, et al.
v.
William S. ELDER, et al.
No. 92-C-1856.
Supreme Court of Louisiana.
October 18, 1993.
*346 Thomas A. Rayer, New Orleans, for applicant.
John D. Rawls, New Orleans, for respondent.
Mark Benjamin Holton, New Orleans, amicus curiae, for Louisiana Press Ass'n.
LEMMON, Justice.[*]
This is a defamation action filed by two attorneys against an investigative television *347 reporter, William S. Elder, and the television station that employed Elder. Plaintiffs seek to recover the damages they sustained because of allegedly defamatory remarks about plaintiffs during the station's televised reports of the investigation of plaintiffs' client, Marie Giordano Lloyd, who along with hundreds of other heirs of Juan Ronquille contracted with plaintiffs to recover title from the State of Louisiana to mineral-rich lands in Plaquemines Parish known as the Cheniere Ronquille tract.
The trial court granted defendants' motion for summary judgment and dismissed plaintiffs' action. The court noted that failure to dismiss an unwarranted defamation action by summary judgment produces long and expensive litigation which has a chilling effect upon free speech.
The court of appeal reversed the summary judgment. 601 So.2d 792. The court first determined that plaintiffs were not "public figures" and therefore were not burdened, under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), with having to prove by clear and convincing evidence that the statements were made with actual malice.[1] Further citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the court concluded that the televised reports contained statements that could reasonably be understood to imply actual facts (as opposed to opinions) about plaintiffs which were capable of defamatory meaning when interpreted by a reasonable juror. Accordingly, the court held that there were actionable factual assertions on which the district court should proceed to trial on the merits.
On defendants' application, this court granted certiorari to determine whether summary judgment was appropriate in this case. 605 So.2d 1105.

Facts
Juan Ronquille originally acquired the pertinent tract by Spanish land grant. The tract was eventually transferred to the State of Louisiana. For several years Lloyd, an heir of Ronquille, and her former attorneys attempted to locate other Ronquille heirs for the purpose of presenting a claim for return of the tract, telling the heirs that the State was holding in escrow $63,000,000,000 in mineral royalties from these lands.[2] Claiming to have a key document that would prove their claim to the land and demanding the heirs' signing of contracts as a prerequisite to share in use of the document, Lloyd entered into written contracts with hundreds of potential heirs, who agreed to give Lloyd twenty-five percent and the attorneys twenty-five percent of any recovery.[3] Additionally, the contracting heirs contributed various sums, some as much as $5,000, to help defray the expenses of the research, investigation and prosecution of a class action to recover the property.[4] At some time prior to 1986, plaintiffs took over the representation of Lloyd and the other heirs.
In early 1986 several class members, concerned that there were discrepancies in the genealogy and that Lloyd may be misleading and misusing them, contacted Elder, who began an investigation of Lloyd's activities. Elder interviewed other heirs and also contacted Douglas Greenburg, the district attorney of Terrebonne Parish where many of the heirs lived and where a grand jury was conducting an investigation into Lloyd's transactions. In May of 1986, Elder attended a meeting of the heirs arranged by Lloyd and the plaintiffs for the purpose of revising the contracts.[5] Elder interviewed several of the *348 heirs in attendance, and the cameraman filmed portions of the interviews and of the meeting.
Elder and the station televised a series of investigative reports between June 1 and July 7, 1986, which showed clips of the May meeting, portions of Elder's interviews with the heirs and with Greenburg, and comments by Elder on the investigation.
Plaintiffs then filed the instant action, claiming that Elder defamed them in these broadcasts. In their petition plaintiffs alleged that Elder, intending to damage plaintiffs' professional reputations, broadcast knowingly false statements that plaintiffs rushed non-clients into signing legal contracts, did not have professional offices or telephones, were attempting to take the heirs "to the cleaners," refused to divulge their last names to their clients, misrepresented the purpose of the meetings, were afraid to have their contracts examined, charged exorbitant and inconsistent fees, unethically solicited clients, refused to give any accounting or answers to the clients, and "entered into an unlawful conspiracy with a `criminal charlatan of the worst order' for the purpose of `duping simple people who really need their money' and for the purpose of committing `extortion' and actions `smacking of fraud.'" Plaintiffs further alleged that Elder suppressed favorable facts, refused to retract statements after learning of their falsity, presented staged events, used innuendo to distort and misrepresent taped statements, and violated professional ethics.
After defendants' answer and extensive discovery, defendants filed a motion for summary judgment. Plaintiffs opposed the motion with affidavits by each plaintiff and by a former investigative television reporter who stated his opinion that the televised reports violated industry standards for ethical and accurate reporting. Also filed in connection with the motion were videotapes of the newscasts, accompanied by written transcripts, which may be described generally as follows:[6]
June 1, 198610 p.m.[7]
The film shows Lloyd "firing up" a crowd of potential heirs with comments such as "[w]e're looking at the Golden Gates." Then there were statements by meeting attendees, followed by Elder's history of the Cheniere Ronquille tract and the activities of the Gretna housewife in gathering heirs to present their claims. Elder stated that Lloyd claimed to hold a key document which would be used to prove their title to the land and demanded that the heirs sign a contract with her in order to avail themselves of the document. After a commentary by three potential heirs on how much money Lloyd collected for the contracts, Elder described, with clips, heirs who were upset about lack of progress and the division in families over the issue. Elder then told of complaints to public officials:
Elder: Before long people were complaining to authorities in several parishes. The case, however, interested only one. District Attorney Doug Greenburg of Terrebonne Parish began digging into the matter.
Greenburg: It's an extortion. I think it smacks of fraud, the taking of anything of value from someone by fraudulent conduct or representation or practice.
Elder: Greenburg says he became angered over who the victims were.

Greenburg: They're mostly little simple people, who probably are not the most educated or informed and very gullible and very human.
Elder: Greenburg's investigation centered on this contract (showing the contract). In it Marie Lloyd Giordano obligates the heirs to pay twenty-five percent to her and twenty-five percent to the lawyers, in the event of any settlement. It also obligates the signee to forfeit $50,000, should they try and break the contract. *349 Now during the week of May 6th, Marie Lloyd Giordano and her attorneys, Joey Montgomery and Martha Sassone, call a meeting at the V.F.W. hall in Gretna. The purpose is to change the contract, the one which the District Attorney is looking into.
Elder stated that the heirs attended in the expectation it would be the final meeting and would bring news of the settlement. Lloyd then explained to Elder the reason for the meeting (to correct the error in the contract granting her a contingent share of the recovery). Then the film returns to the meeting, with Lloyd exciting the crowd and offering to autograph copies of newspaper stories of Greenburg's investigation. Elder and the camera were removed from the room before Lloyd discussed the contracts with the crowd. Lloyd then told the heirs who didn't want to sign the contract to leave, and they would be sent a bill for all services. Elder then asked plaintiff Montgomery:
Elder: Let me ask you why are you afraid for us to look at the contract.
Montgomery: This is our personal business. This is a contract, a contingency contract. We're not interested in having the news media in on this. I don't think it's any of your affair. But you may we talked to you about it before. This is our own business. I think this is an internal matter of the group, and I think its a matter of
Elder: You're not trying to take these people to the cleaners, are you?

Montgomery: No sir-ree.
Elder then pictured three of Lloyd's critics outside the hall:
Elder: Outside of the hall, some people were beginning to get upset over what had taken place.
Critic: I think that these people are making an honest living at what they're doing. They're out there busting their behinds to make the money they're getting. Now if she's ripping them off, she needs to stay in here and tell these people the truth.
Critic: You are not allowed to talk to an attorney. If you talk to an attorney you are charged $50. My daughter tried to reach the attorneys. They do not have a working number.

Critic: Marie herself told us that there was billions in escrow. She told us that herself, and she also told us that the claims were already filed.
Elder then reported checking with the Department of Natural Resources and learning that there was no escrow account.
Elder next reported that a Terrebonne Parish grand jury had begun receiving evidence of possible fraud in Lloyd's activities, showing District Attorney Greenburg's comment:
Greenburg: This person is a criminal charlatan of the worst order, because they're duping simple people who really need the money.

The newscast winds up with Elder questioning Lloyd about the red and white colors worn by her followers, with Lloyd stating that the colors symbolize the Sacred Heart who is helping them in their quest.
June 3, 1986noon
Report of pickets at the station, with Elder briefly recapping the June 1 newscast.
June 3, 19865 p.m.
Report of noon picketing and brief recap. Then an heir, who had been subpoenaed to testify before the grand jury, showed several receipt books and claimed that she and a cousin had collected over $250,000 for Lloyd, who had required "strictly cash." She further asserted that Lloyd never told them what she (Lloyd) was doing with the money and threw them out of the meeting when they asked questions.
June 4, 19866 a.m.
Essentially the same as June 3.
June 9, 19865 p.m.
Elder reports briefly that a federal investigation is underway, as well as the probe in Terrebonne Parish, and that investigators say Lloyd may be involved in fraud. Essentially the same report was repeated by the anchor at 10 p.m.
June 10, 19865 p.m.

*350 Elder reports on the two investigations and refers to his initial report on how Lloyd convinced nearly a thousand people that they will inherit millions because she supposedly holds secret documents and how the potential heirs paid her $1,200 to $5,000 each. Elder then reported that Lloyd's mother stated her daughter "needs psychiatric help" and "has absolutely nothing." The mother added that Lloyd merely asked for money and the people were "foolish enough to give it to her." The 10 p.m. report added that the Terrebonne Parish investigation was in its last stages.
June 17, 198610 p.m.
Elder reports that the Terrebonne grand jury was meeting the next day to decide if it was fraud for Lloyd to put pressure on elderly and disadvantaged people to sign contracts to recover billions of dollars from an escrow fund that the State says does not exist. Three heirs described the perceived pressure. Then Elder asks the rhetorical question:
Elder: Was it wrong for Marie and her attorneys, Martha Sassone and Joey Montgomery, to try and rush nearly a thousand people into signing a binding legal contract during that meeting at the V.F.W. Hall in Gretna late in April?

Then Elder shows an interview with an heir:
Salis: All we know is Joe and Martha, no last names, and they said if you have any questions, we're not going to answer no questions tonight.
Elder: You're telling me that no one in this hall had any idea what the last names were of these two lawyers.

Salis: Ah, nobody, no one that I spoke with. They had about a thousand people.

Elder: Did you ask? Did you ask?
Salis: Ah, well, they were asking me if I knew their last names.

Elder: The people were asking you?
Salis: Yea, some people were asking me, and they were asking each other, "What's their last names, where are their offices," and nobody knew, because a few people said they would like to go to the lawyers' office.

Elder: And yet they wanted you to sign a binding legal contract with them?
Salis: Yes.
Elder: And did you sign it?
Salis: Yes, I did.
Then Elder questioned whether Lloyd intimidated heirs to keep them from knowing too much, with an heir describing intimidation by Lloyd and her security guards while displaying weapons. Finally an heir told of giving $3,500, representing half his life's savings, to Lloyd.
June 18, 1986noon
Elder reported from the Terrebonne court house of Lloyd's followers clad in red and white, and disgruntled heirs who had split from their families over the situation appeared in brief clips. Lloyd was shown announcing that she had invoked the privilege against self incrimination on advice of counsel. Elder then speculated as to the timing of the grand jury action.
The story was essentially repeated at 5 p.m., 6 p.m., and 10 p.m., but Elder added a film clip of a Lloyd supporter expressing continued confidence in her, as well as clips from prior broadcasts.
Newscasts on July 3, 6 and 7 reported on Lloyd's indictment by the Terrebonne grand jury. (emphasis added).
Plaintiffs contend that Elder defamed them in the portions of the newscasts quoted above. Defamation is an invasion of a person's interest in his reputation and good name. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 111 (5th ed. 1984). In order to prevail in a defamation action, the plaintiff must prove that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages. Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196 (La.1980); Ritchey v. Azar, 383 So.2d 360 (La.1980). Because the present case is at the summary judgment stage, a discussion of the standard for summary judgments in defamation cases is appropriate.
*351 Summary Judgment Standard in Defamation Cases
A motion for summary judgment shall be granted when the mover establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. La.Code Civ.Proc. art. 966 B. The decision is made on the basis of the pleadings, affidavits and discovery documents in the record. Id.
In the present case the court of appeal, citing a federal appellate decision, held that the standard for summary judgment in defamation cases is the same as the standard in any other civil case. While that statement may be accurate in the federal system, this court has long employed a different standard for summary judgment in defamation cases. Because the threat of unmeritorious litigation could otherwise have a chilling effect on freedom of the press, adequate protection of that constitutional guarantee requires that plaintiffs in defamation cases demonstrate at an early stage that they can meet their burden of proof at trial. Otherwise, media defendants will be subjected by even the threat of unmeritorious action to an inordinate amount of self-censorship which could significantly infringe upon their constitutionally protected freedom. In cases affecting the exercise of freedom of the press, proper summary judgment practice is essential. Mashburn v. Collin, 355 So.2d 879 (La.1977). Thus, in order to survive a motion for summary judgment, a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he likely will be able to meet his burden of proof at trial. Without such evidence, there is no genuine issue of material fact, and summary judgment should be granted.[8]
The misplaced reliance by the court of appeal on federal pronouncements probably results from the difference in state and federal practice in summary judgment procedures in non-defamation cases. In the federal system, when the nonmoving party bears the burden of proof at trial, there is no genuine issue of material fact if the nonmoving party cannot come forward at the summary judgment stage with evidence of such sufficient quantity and quality for a reasonable juror to find the party can satisfy his substantive evidentiary burden. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court in Celotex stated:
In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
477 U.S. at 322-23, 106 S.Ct. at 2552. The "purpose of summary judgment in the federal system is to `pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e), Advisory Committee Note to 1963 Amendment).
In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), a defamation case against a media defendant, the Court held that when the First Amendment requires clear and convincing evidence as the standard of proof (actual malice cases), the trial judge, in deciding a *352 summary judgment motion by the party who does not bear the ultimate burden of proof, must determine whether the evidence supporting the nonmover's case would allow a reasonable juror to find that the nonmover can satisfy that evidentiary burden.
In Louisiana, however, there is a strong preference for full trial on the merits in non-defamation cases. Because of the resulting heavy burden on the mover, a showing by the mover that the party with the ultimate burden of proof likely will not meet his burden at trial is an insufficient basis for summary judgment. Adams v. Travelers Ins. Co., 420 So.2d 507 (La.App. 2d Cir.), cert. denied, 422 So.2d 426 (La.1982); Yocum v. City of Minden, 566 So.2d 1082 (La.App. 2d Cir.1990); Morgan v. Campbell, Campbell & Johnson, 561 So.2d 926 (La.App. 2d Cir. 1990). Summary judgments are to be sparingly granted. Pace v. Zilka, 484 So.2d 771 (La.App. 1st Cir.), cert. denied, 488 So.2d 691 (La.1986). Any doubt is to be resolved against granting the motion. Cooke v. Allstate Ins. Co., 575 So.2d 404 (La.App. 4th Cir.1991).
Therefore, while in the federal system the standard for summary judgment may be the same in all cases, there is a different standard in Louisiana in defamation cases because of the constitutional considerations in such cases. Because a media defendant's having to go to a full trial in multitudes of nonmeritorious defamation claims would certainly stifle the constitutional guarantee of freedom of the press, the rule in other summary judgment cases favoring trial on the merits is simply not applicable in defamation cases. See also Bussie v. Lowenthal, 535 So.2d 378 (La.1988); Schaefer v. Lynch, 406 So.2d 185 (La.1981); Kidder v. Anderson, 354 So.2d 1306 (La.), cert. denied, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978).

Statements by Elder
Recognizing that the court in a defamation case must consider the entirety of a statement in determining whether the statement is actionable, we consider separately the five portions of the investigative reports which plaintiffs point to as defamatory. Of course, each portion will be considered in the context of the entire report.
A defamatory communication is one that tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Restatement (Second) of Torts § 559 cmt.e (1977). The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is one for the court.[9]Bussie v. Lowenthal, 535 So.2d 378, 382 (La.1988); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 111 (5th ed. 1984); Restatement (Second) of Torts § 614 (1977). That question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. 2 F. Harper et al, The Law of Torts § 5.4 (2d ed. 1986).
We conclude that the communications at issue in this case were not defamatory and therefore not actionable. Accordingly, we do not reach the issues of whether the statements were false or whether plaintiffs were required to prove actual malice.[10]
The first communication was the portion of the June 17 newscast in which Elder, after reporting that the grand jury was meeting to decide whether there was fraud involved in Lloyd's efforts to sign the *353 heirs to contracts by claiming possession of key documents for recovery of billions of dollars of funds that the State declared were non-existent, posed the rhetorical question: "Was it wrong for Marie and her attorneys, Martha Sassone and Joey Montgomery, to try and rush nearly a thousand people into signing a binding legal contract during that meeting at the V.F.W. Hall in Gretna late in April?"
Of course, Elder asked the question simply for effect and did not expect an answer, nor did he provide one. He did not state, as a matter of fact or opinion, that Lloyd had acted fraudulently (although he reported circumstances suggesting pressure in obtaining signatures). He merely posed the question for public consideration, thereby expressing suspicion about activities which clearly raised the suspicions of many Ronquille heirs and others. Although defamation can occur by means of a question, this question which Elder posed to the television viewers for their consideration was not one which, in and of itself, the listener would have reasonably understood to be intended in a defamatory sense so as to harm plaintiffs' reputations and to lower their community esteem.
The second communication occurred during the lengthy June 1 newscast when Elder asked plaintiff Montgomery to photograph people signing the new contract, and Montgomery refused on the basis that it was private business between him and his clients. Whereupon Elder asked Montgomery, "You're not taking these people to the cleaners, are you?" Montgomery emphatically denied this suggestion.
This question, much like the rhetorical question about the wrongness of Lloyd's and plaintiffs' activities surrounding the signing of the new contracts, merely expressed suspicion and indeed offered Montgomery an opportunity to explain the contract and the surrounding circumstances. Again, this direct question was not one which a reasonable listener would have taken to so harm plaintiffs' reputations as to lower the community's opinion of them. The unusual circumstances surrounding the heirs' signing of contracts presented a situation about which Elder was entitled to investigate and to raise questions for public consideration.
Elder's use of interviews of two heirs to tell the television audience that some heirs believed plaintiffs did not have working telephone numbers and that some heirs at the May 6 meeting did not know plaintiffs' last names is also not defamatory. In the June 1 newscast Elder published statements by three of Lloyd's critics. The second critic stated that her daughter tried to reach the attorneys, but "[t]he do not have a working number." Pointing to Elder's admission in his deposition that he had telephoned plaintiffs and thus knew that plaintiffs had operating office telephones and listed numbers, plaintiffs argue that the critic's statement, published by Elder without equivocation or limitation, communicated to the viewer that plaintiffs did not have working telephone numbers, a fact Elder knew to be false. The key question is whether the critic's statement is defamatory.[11] Plaintiffs argue that a statement to a television audience that an attorney does not have a working telephone number conveys the message that the lawyer is somewhat shady or is practicing law in a manner suggestive of substandard operations, thereby impugning the lawyer's reputation and reducing his esteem in the community.
Plaintiffs in effect claim defamation by innuendo. In defamation by implication or innuendo, the court must distinguish between statements of opinion and statements of fact. In the case of opinion, if the defendant states non-defamatory facts on which he bases his derogatory opinion, he is not liable for defamation unless the opinion indicates the existence of other facts which are defamatory and would justify the forming of the opinion. Restatement (Second) of Torts § 566 cmt.c (1977). But if the defendant states a derogatory opinion without disclosing the facts on which it is based, he may be liable for defamation if the comment creates *354 the reasonable inference that the opinion is justified by the existence of undisclosed defamatory facts. Id.
Elder's use of the critic's comment was a statement of fact that one person attempted to telephone one of the plaintiffs one time and somehow came to the conclusion that the lawyer did not have a working number. This may not be the pinnacle of fairness in news reporting by a reporter who had himself telephoned the lawyer, but the issue here is defamation. Unless implications are considered, the critic's statement is not defamatory. But when the court looks not at what was said, but at what impression was created, a media publication can give rise to an infinite number of impressions. When a public figure and matter of public concern are involved, perhaps there can be no defamation by implication. See Schaefer v. Lynch, 406 So.2d 185 (La.1981). But even if this court were to recognize defamation by implication in actions by private plaintiffs against media defendants (an issue we hereby pretermit), adequate protection of freedom of the press at least requires that the plaintiffs prove that the alleged implication is the principal inference a reasonable reader or viewer will draw from the publication as having been intended by the publisher.[12]
Here, a reasonable viewer would not draw, from the critic's statement of her daughter's hasty conclusion, the principal inference that plaintiffs are shady lawyers. Any number of equally plausible inferences can be drawn from the brief statement. Accordingly, we conclude that a reasonable viewer could not have understood the words as intended in a defamatory sense. The statement, especially when considered in the context of several consecutive statements critical of Lloyd, does not give rise to a defamatory inference. Bussie v. Lowenthal, 535 So.2d 378, 382 (La.1988).
Similar to the preceding statement, Elder published on June 17 a question-and-answer session with an heir which focused on that person's statement that he and other heirs attending the May 6 meeting did not know plaintiffs' last names. In their affidavits plaintiffs asserted that they introduced themselves with their full names at the May 6 meeting. Because Elder had left a microphone in the hall when he was ushered out and because he admitted in his deposition that he listened to portions of the meeting from outside the hall after his departure, plaintiffs contend it is at least a jury question whether Elder knew the heir's statement about plaintiffs' last names was false. They further contend that the statement that an attorney failed to disclose his or her last name to a mass meeting of clients-heirs was defamatory. According to plaintiffs, such a statement tells the television audience, for no apparent reason other than to undermine the perception of the lawyer's integrity, that this lawyer operates in a clandestine manner so as to hide his or her identity.
The heir's comments simply stated that he and several other heirs in attendance did not know the last names of the new lawyers brought in by Lloyd. Although the extended interrogation of this heir was of questionable newsworthiness, a reasonable listener to the communication, especially when considered in the context of the entire newscast, could not draw the principal inference that plaintiffs lacked integrity or operated their practices in an unethical manner, or understand the communication in a manner that would lower plaintiffs' reputations and community esteem.
Elder's statements in the June 1 newscast about his interview with Greenburg present a tougher question on defamation. Elder followed his lead-in statement "District Attorney Doug Greenburg began digging into the matter" with a clip of Greenburg saying in an apparently positive declaration, "It's an extortion. I think that it smacks of fraud...." But in a subsequent deposition Greenburg asserted he made the taped comment, not as his views on the proved criminality *355 of Lloyd's activities as established by acceptable evidence, but in response to Elder's hypothetical question which assumed the truth about Lloyd's activities described by Elder. Greenburg stated that he was shocked by the inaccurate representation of the total interview in which he gave "a general response to a question of a general criminal law nature."
In the next clip of Greenburg's interview, Elder suggested Greenburg's anger over the vulnerability of the "victims," but Greenburg in deposition denied characterizing anyone as a victim. He stated that in the taped interview he described the people who complained to him as persons of limited means who could have been misled, but did not express an opinion that they had been victimized, as he believed the investigative report had led viewers to believe.
Later, Elder led in with the statement "District Attorney Doug Greenburg minced no words in describing the alleged actions of one Marie Lloyd Giordano," followed by Greenburg's taped statement that "[t]his person is a criminal charlatan of the worst order." In his deposition Greenburg asserted that his interview statement was to the effect that if the allegations about Lloyd were proved, this person was a criminal charlatan of the worst order.
Elder followed these statements about Lloyd with a statement that Greenburg's investigation centered on the contract (shown on the screen) which obligated the heirs to pay a substantial amount of any recovery to Lloyd and to "the lawyers," and then named plaintiffs as the lawyers who together with Lloyd called the meeting to change the contract that "the district attorney is looking into."
Elder's use of Greenburg's statements arguably present a jury question whether the statements were maliciously misused and so distorted as to be untrue. But malice and falsity do not become pertinent until it is determined at the outset whether the communications were defamatory to these plaintiffs.
Significantly, neither Greenburg in the clips of his interview nor Elder in his comments leading into the clip of Greenburg's interview ever mentioned plaintiffs. The ten-minute report of June 1 concentrated on Lloyd and her use of claimed documents to secure substantial payments and contingency contracts from other heirs for recovery of billions of dollars held in an escrow account disclaimed by the State. Elder carefully used words like "possible fraud" and "alleged actions" to describe Lloyd's activities, and then presented comments on "the alleged actions of one Marie Lloyd Giordano" by Greenburg, who was conducting an investigation into the heirs' complaints about Lloyd. The harsh comments by Greenburg, whatever the context, were directed at Lloyd (who was eventually indicted for fraud) and not at plaintiffs. After Greenburg's statements, Elder did refer to the contracts and to the meeting called by Lloyd and plaintiffs to revise the contracts. But the connection between Lloyd's using claimed documents to solicit heirs for contributions and contracts over several years and plaintiffs' role in the May 16 meeting to sign new contracts was tenuous at best.
After reviewing the videotape of the June 1 news report containing the excerpts of Greenburg's interview, and considering the report in its entirety, we conclude that the report could not be understood by a reasonable and detached viewer so as to harm plaintiffs' reputation or to lower their esteem in the community. We hold that the use of Greenburg's interview, although arguably distorted, did not constitute defamation as to these plaintiffs and was not actionable.
In summary, we conclude that the overall news reports focused on questions rather than conclusions and that the communications pointed out by plaintiffs, when considered in the context of the overall reports and the almost total emphasis on Lloyd's suspicious and protracted activities, were not capable of being understood by a reasonable viewer as intending a defamatory meaning toward these plaintiffs.

Decree
For these reasons, the judgment of the court of appeal is reversed, and the judgment *356 of the district court maintaining the motion for summary judgment is reinstated.
DENNIS, J., concurs with reasons.
DENNIS, Justice (concurring).
I respectfully concur.
I believe that a firmer foundation is available for the greater part of the court's decision, although I cannot say that the majority is incorrect in its analysis in any respect.
Prior to the adoption of our state constitution a plurality of the Supreme Court in Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) would have extended the constitutional privilege to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." Id. at 43, 91 S.Ct. at 1820. The Supreme Court did not clearly retreat from this position until its decision in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), decided June 25, 1974, subsequent to the ratification of the 1974 Louisiana Constitution on April 20, 1974. Consequently, it is permissible and appropriate for this court to interpret the Article I, § 7 freedom of expression guarantee to grant broader protection of these important rights than that afforded by the current federal standard, under a criterion similar to that proposed by the Rosenbloom plurality.
Applying a Rosenbloomesque standard and the Mashburn v. Collin, 355 So.2d 879 (La. 1977) summary judgment precepts to the present case, I conclude that (1) the defendant's derogatory expressions relating to the plaintiff attorneys were part of "discussion and communication involving matters of public or general concern," and therefore were privileged under Article I, § 7 of the 1974 Louisiana Constitution unless uttered with knowing or reckless falsity; (2) the plaintiff opponents to summary judgment have not shown that a judge or jury reasonably could find by clear and convincing evidence that most of the alleged defamatory statements were made with knowing and reckless falsity; (3) the defendant's alleged misrepresentation of the district attorney's remarks about Marie Giordano Lloyd's conduct were not defamatory of the plaintiff attorneys for the reasons assigned by the majority opinion.
NOTES
[*] Judge Melvin A. Shortess of the Court of Appeal, First Circuit, participated in this decision as Associate Justice Pro Tempore in place of Associate Justice Luther F. Cole, now retired, who was still a member of the court when the case was argued.
[1] The Sullivan decision held that actual malice is proved with evidence that the offending statement was known to be false or was made with reckless disregard of whether it is false or not.
[2] Through the efforts of Lloyd and/or plaintiffs, the Legislature passed an act which apparently authorized the Ronquille heirs to assert and prove their claim to the tract.
[3] The heirs also agreed to forfeit $50,000 if they withdrew from the contract.
[4] The record in this case contains a judgment in a separate action by members of the class of heirs against Lloyd, which indicates from an accounting filed therein that Lloyd collected in excess of $1,000,000 from the heirs.
[5] Apparently, since Lloyd was not an attorney, the new attorneys deemed it necessary to have contingency fee contracts for the attorneys that did not include a provision for Lloyd to share in the recovery. Lloyd was subsequently indicted in Terrebonne Parish for practicing law without a license.
[6] The quotations from the written transcripts have been corrected, after reference to the videotapes, for spelling and grammatical errors. The statements claimed to be defamatory are underlined.
[7] Some of the newscasts were repeated at subsequent news hours.
[8] The standard for summary judgment was stated slightly differently in Mashburn because the pivotal issue was whether the comment was made with knowing or reckless falsity. 355 So.2d at 890. We certainly have no intention here to weaken the Mashburn holding. However, because we ultimately decide the present case on the absence of defamatory meaning and do not reach the issue of whether the plaintiffs must prove actual malice, the standard for summary judgment is stated here without reference to actual malice.
[9] The question of whether a communication, which is capable of a defamatory meaning, was so understood by the recipient is for the jury.
[10] Because we decide this case on defamatory meaning and do not reach the issue whether there was actual malice involved, we do not decide whether plaintiffs were private individuals involved in matters of public concern and do not address whether the actual malice standard applies in actions by private individuals against media defendants in matters of public concern. In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court held that the First Amendment did not require the Sullivan malice standard in a private individual's action involving a matter of public concern, but left the states open to fix the standard as long as the state did not permit (1) liability without fault or (2) recovery of punitive damages on less than actual malice.
[11] The publisher of a false statement by another person, when the publisher knows the statement to be false, is not protected by the fact that someone else made the statement. Cianci v. New York Times Co., 639 F.2d 54 (2d Cir.1980).
[12] In Saenz v. Playboy Enterprises, Inc., 841 F.2d 1309 (7th Cir.1988), a newspaper reported that the plaintiff had been shot when found with another woman's husband. The newspaper was held liable for defamation because of the principal implication that statement created when the paper failed to state that the occasion was a social gathering of a number of persons including plaintiff's own husband.