PETERS, J.
concurring in part and dissenting in part.
hi agree with the majority’s affirmation of the trial court’s judgment in every respect except its affirmation of the trial court’s grant of a partial summary judgment in favor of Tynes Mixon, M.D., Andrew Hargroder, M.D., and Doreen Abad-co, M.D., on the issue of future rents. I would reverse that portion of the judgment finding the existence of genuine issues of material fact and would remand the matter to the trial court for further proceedings on that issue.
In order for the trial court to have reached the conclusion that Southpark Acquisition “was evicted or otherwise disturbed in its peaceful possession of the subject property[,]” it had to have considered the merits of the issue before it by making credibility determinations, evaluating testimony, and weighing evidence. The majority recognizes this error when it notes that the trial court’s December 10, 2010 judgment contains the language that Southpark Acquisitions “was evicted or otherwise disturbed in its peaceful possession of the subject property[.]”
Additionally, while the majority recognizes that “the determinative facts at issue are whether the lessee’s undisputed right to peaceful possession of the leased premises was disturbed by the lessor[,]” it simply accepts the inappropriate factual ^determination made by the trial court on this issue. This is a summary judgment case, and the acceptance of the trial court’s factual determination by the majority is clear error. Additionally, the majority attempts to draw a distinction within the lease itself by suggesting that this “matter involves a dispute between a lessor and a lessee, not a lessor and a hospital.” In attempting to draw this distinction, the majority ignores the clear language of the lease agreement to the effect that “[t]he *823 Premises shall be used by the Tenant for the operation of a hospital, as allowed by the City of Lafayette, the United States Government and licenses by the State of Louisiana.” (Emphasis added.) The purpose of the lease agreement cannot be separated from the physical location and Southpark Acquisition’s rights under the lease were wholly contingent upon its continued operation of the Southpark Community Hospital.
Summary judgment is a procedural device employed to avoid a trial on the merits when no genuine issue of material fact exists. Duncan v. U.S.A.A. Ins. Co., 06-363 (La.11/29/06), 950 So.2d 544. While La.Code Civ.P. art. 966(A)(2) provides that summary judgment is “designed to secure the just, speedy, and inexpensive determination of every action” and that the “procedure is favored and shall be construed to accomplish these ends[,]” it is not to be a substitute for a trial on the merits. At the time of this litigation, La.Code Civ.P. art. 966(B)(2) provided that judgment shall be rendered “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law.”[1]
Is A “genuine issue” is a “triable issue.” Toups v. Hawkins, 518 So.2d 1077, 1079 (La.App. 5th Cir.1987) (citing Brown v. B & G Crane Service, Inc., 172 So.2d 708, 710 (La.App. 4 Cir.1965)). More precisely, “[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes.” W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 481 (1983). In determining whether an issue is “genuine,” courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. Simon v. Fasig-Tipton Co. of New York, 524 So.2d 788, 791 (La.App. 3d Cir.), writs denied, 525 So.2d 1048, 1049 (La.1988); Pace v. Zil-ka, 484 So.2d 771 (La.App. 1st Cir.), writ denied, 488 So.2d 691 (La.1986); Mecom v. Mobil Oil Corp., 299 So.2d 380, 386 (La.App. 3d Cir.), writ denied, 302 So.2d 308 (La.1974). “Formal allegations without substance should be closely scrutinized to determine if they truly do reveal genuine issues of fact.” Brown, 172 So.2d at 710; Sally Beauty Co. v. Barney, 442 So.2d 820, 822 (La.App. 4th Cir.1983).
A fact is “material” when its existence or nonexistence may be essential to plaintiffs cause of action under the applicable theory of recovery. Penalber v. Blount, 550 So.2d 577, 583 (La.1989). “[Fjacts are material if they potentially insure or preclude recovery, affect a litigant’s ultimate success, or determine the outcome of the legal dispute.” South Louisiana Bank v. Williams, 591 So.2d 375, 377 (La.App. 3d Cir.1991), writs denied, 596 So.2d 211 (La.1992). Simply put, a “material” fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. Sassone v. Elder, 626 So.2d 345, 352 (La.1993); Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Co., 427 So.2d 1152, 1153-54 (La.1983) (collecting cases); McCoy v. Physicians & *824 Surgeons Hospital, Inc., 452 So.2d 308, 310 (La.App. 2d Cir.), writ denied, 457 So.2d 1194 (La.1984) (noting that “[s]ummary judgment may not be used as a substitute for trial”).
Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 751 (alteration in original).
The hearings associated with the original motions for summary judgment, the motion for new trial, and the motion to reconsider the ruling on the original motions produced volumes of evidentiary exhibits to be considered by the trial court, and all will not be reproduced in this dissent. However, my review of the ^record causes me to reach the conclusion that the trial court erred in granting the guarantor defendants’ motion for summary judgment on the issue of future rents.
The primary evidence in support of the guarantor defendants’ position that South-park Acquisition never intended to abandon the hospital and that Broussard’s actions basically evicted it comes from the deposition testimony of Mr. Ramirez, Mr. Gregory and Mr. Mullin. All three men testified that they never intended to close the hospital and that they intended to maintain a skeleton-crew presence beginning June 3, 2009, for the purpose of protecting the hospital license. Mr. Ramirez described this effort as three-person crews consisting of a nurse-supervisor, a plant-operations manager, and a medical-records director who would keep the hospital open on a twenty-four-hour basis for the limited purpose of evaluating, stabilizing, and transferring to other facilities any patients who might find their way to the hospital for medical care. According to Mr. Ramirez, if the hospital license was revoked, it would take six to eight months to recover it, and Mr. Gregory pointed out that without a license, a hospital is just a “piece of real estate.”
In explaining away the very precise language of the June 3, 2009 memorandum to the employees, as well as the two notices placed on the hospital door, Mr. Ramirez testified that that information was for the hospital staffs benefit only and, that when he discovered the notices had been placed on the hospital door, he immediately removed them. Mr. Gregory suggested that the statement really meant that the hospital was closing as a full-service, fully-staffed hospital.
According to Mr. Ramirez, the skeleton crew was present and the hospital was open for business on the morning of June 4, 2009, but that only one door of the facility remained unlocked. However, when the writ of sequestration was Rposted to the hospital door on June 5, 2009, and when its counsel received an email that same afternoon from Brous-sard’s counsel which stated that Broussard took “the position that Southpark Acquisition (and, of course Southwest Health Group) has no further authority to be on the premises, and we will take any action the law allows against any person from either of those entities who trespasses upon the property of my client[,]” South-park Acquisition took the position that it could no longer occupy the premises.
The evidence in opposition to this position raises numerous genuine issues of material fact. The hospital discharged its last patient on May 29, 2009, and remained vacant from that point forward. HIG began removing equipment subject to its lien sometime in late May,[2] and the language *825 used in the three documents prepared for distribution on June 3, 2009, is very clear in its assertion that the hospital was closed effective that date. Additionally, no one with the hospital or Southpark Acquisition communicated to Broussard the activities in late May and early June. Furthermore, despite Mr. Ramirez’s statement that the notices were not to be posted on the hospital door and that he took them down immediately, the October 14, 2010 affidavit of Ronnie Boone, a caretaker of the hospital, asserted that the notices were still on the door the day he signed his affidavit.
Other evidence tending to discredit the assertion that the hospital was to remain open included the emails and documentation provided DHH concerning the status of the hospital. DHH’s records contain an email stating that it sent an on-site survey team to the hospital on June 8, 2009, which found the hospital closed; a |fiIetter from Mr. Gregory faxed to DHH on June 8, 2009, stating that “[ejffective June 4, 2009, Southpark shall cease operations and terminate its hospital license and Medicare provider agreement[;]” and a June 8, 2009 report from a DHH nurse to the effect that the June 3, 2009 notices were still on the hospital door on that day and that Mr. Ramirez had informed him that only one nurse remained on duty after June 3, 2009, and that he/she remained on duty only until 3:00 p.m. on June 4, 2009.
An affidavit from Dr. Spiller asserted that he spoke to Mr. Ramirez, who told him that his communication with DHH had not gone well and that the hospital would have to be shut down completely because it did not have adequate staff to accept patients. According to Dr. Spiller, Mr. Ramirez told him on June 5, 2009, that South-park Acquisition would be turning over the keys to Broussard’s custodian on the following Monday, June 9, 2009.
Finally, Broussard introduced the affidavit of Nicholas Gachassin, III, a Lafayette, Louisiana attorney specializing in hospital regulatory matters. After reviewing Southpark Acquisition’s June 3, 2009 closure notice and press release and Mr. Ramirez’s June 3, 2009 memo, he opined that under DHH’s Hospital Licensing Standards, Southpark Acquisition ceased operating on June 3, 2009, and that Southpark Acquisition’s license was immediately void as of June 3, 2009. Moreover, Mr. Gachas-sin opined that maintaining a nurse on site would not protect Southpark Acquisition’s license because its license was “wholly dependent on being open for business to serve the community and having the ability to take care of patients who require admission. Keeping a nurse on-site, in my opinion, is not sufficient to maintain a Hospital’s license. And, there is no legal or regulatory basis to ‘preserve a hospital license’ once you cease operating.”
[7In finding that genuine issues of material fact exist as to whether Broussard evicted Southpark Acquisition from the premises or whether Southpark Acquisition abandoned the premises, we also note that pursuant to DHH’s regulations, Southpark Acquisition’s operating license was immediately voided on June 3, 2009, after all of the hospital’s employees were laid off. Louisiana Administrative Code 48:1, § 9307 specifically states that “[a] cessation of business is deemed to be effective with the date on which the hospital stopped providing services to the community.” Furthermore, LAC 48:1, § 9303 defines a “hospital” as:
*826 [A]ny institution, place, building, or agency, public or private, whether for profit or not, maintaining and operating facilities, 24 hours a day, seven days a week, having 10 licensed beds or more, properly staffed and equipped for diagnoses, treatment and care of persons admitted for overnight stay or longer who are suffering from illness, injury, infirmity or deformity or other physical or mental condition for which medical, surgical and/or obstetrical services would be available and appropriate.
In the matter before us, Southpark Acquisition ceased to operate as a hospital on June 3, 2009. While the facility had more than ten licensed beds, it was no longer “properly staffed and equipped” to perform its functions as a hospital. That is to say, it ceased providing hospital services to the community on that day. While South-park Acquisition’s argument is that this action was temporary, there are numerous contested facts that suggest otherwise. By its actions, the hospital ceased being just that, a hospital, without any action required on the part of Southpark Acquisition to surrender its operating license.
Furthermore, despite the officer’s well-rehearsed and often-stated mantra that Southpark Acquisition was protecting the hospital’s license by maintaining a skeleton crew, they knew that the hospital’s operating license was no longer valid [Sas of June 3, 2009. In a June 4, 2009 email, sent at 4:24 p.m. from Mr. Mullin to Southpark Acquisition’s counsel, he admits that DHH informed Southpark Acquisition that it could not continue operating unless it maintained a full staff.
Southpark Acquisition’s assertion that it was attempting to preserve the license for its possible replacement is also not persuasive because the license would still have been void in the event Southpark Acquisition was successful in finding another entity to take over the hospital. Pursuant to LAC 48:1, § 9305, the operating license is not assignable or transferrable and becomes immediately voided upon a change of ownership.
Based on the foregoing summary, I find that the evidence presented establishes that genuine issues of material fact remain on the issue of future-rent recovery which require a merits trial to resolve. Having made that finding, I would reverse the trial court’s grant of summary judgment in favor of the defendants dismissing Broussard’s claims for future-rent payments. At trial, Broussard attempted to proffer the evidence submitted in support of, and in opposition to, the conflicting motions for summary judgment. However, the guarantor defendants objected to evidence submitted in the proffer on various grounds, and the trial court sustained the objection. That being the case, the record before us on the summary judgment issues is not complete, and I would remand the matter to the trial court for a new trial on these issues. Cangelosi v. Our Lady of the Lake Reg’l Med. Ctr., 564 So.2d 654 (La.1989).

. 2012 La. Acts No. 257, § 1 and 2013 La. Acts No. 391, § 1 both amended La.Code Civ.P. art. 966 and made significant procedural changes to this section of the article.

. In their deposition testimony, Mr. Ramirez, Mr. Gregory, and Mr. Mullin, when asked about the removal of property from the hospital were very careful to state that Southpark Acquisition had not removed any property. It was only when questioned directly that Mr. *825 Gregory and Mr. Mullin acknowledged that HIG had removed property before suit was filed.