715 So.2d 1281 (1998)
Ann Lang FITZGERALD, Plaintiff-Appellee,
v.
Thomas C. TUCKER, et ux., Defendants-Appellants.
No. 97-916.
Court of Appeal of Louisiana, Third Circuit.
July 29, 1998.
*1283 Carl William Robicheaux, Lafayette, for Ann Lang Fitzgerald.
John H. Ayress, III, for Thomas C. Tucker, et ux.
Bobbie Jindal, for State of Louisiana Dept. of Hosp.
Before YELVERTON, WOODARD, DECUIR, AMY and PICKETT, JJ.
WOODARD, Judge.
The defendant, Thomas C. Tucker (Tucker), appeals from a jury verdict in favor of the plaintiff, Ann Lang Fitzgerald (Fitzgerald), awarding her $50,000.00 in damages for defamation and $56,600.00 for tortious interference with her employment contract. We affirm in part, reverse in part, and modify.

FACTS
This litigation arose from Fitzgerald's and Tucker's involvement with the Louisiana State Board for the Certification of Substance Abuse Counselors (Board), which is part of the State of Louisiana, Department of Health and Hospitals and is responsible for testing and supplying certification for substance abuse counselors. The Board was initially headquartered in Lafayette, Louisiana, but was later moved to Baton Rouge, Louisiana.
Before Fitzgerald received board certification as a substance abuse counselor, she worked part-time as an administrative assistant to Donald Trahan, the former executive director of the Board. After Trahan and the office secretary quit, Fitzgerald worked as the Board's administrative director from June 1, 1992 until she resigned on November 2, 1992. Tucker was elected Board chairman on October 31, 1992 and served in that capacity until sometime in May or June of 1994. Even when he was no longer a Board member, he continued to be involved with Board business in his capacity as consultant to the Board. Before that, Tucker had served as a board member and, additionally, was chairman of the Board's ethics committee.
Fitzgerald worked alone at the Board's office after her promotion. One of her official duties as administrative director was to inform substance abuse counselors of complaints filed against them. On October 27, 1992, Fitzgerald was required to advise Tucker's wife, Karen Tucker, of a complaint that was filed against her. Her involvement in that complaint consisted of signing the notification sent to Mrs. Tucker, which was received on October 30, 1992. At that time, Tucker had not yet been elected as the Board's chairman.
Once Tucker assumed his position as chairman of the Board on November 2, 1992, Fitzgerald resigned from her position as the Board's administrative director. Her decision was due, in part, to her dislike for the way that he had run the ethics committee. She then contracted with the State of Louisiana, Department of Health and Hospitals to work as a substance abuse counselor in the detoxification unit at the University Medical Center (UMC) in Lafayette. Also working at UMC, on the same floor, was Mrs. Tucker, who is also a board-certified substance abuse counselor.
Several events then ensued. Upon assuming office, Tucker discovered that seventeen certificates were improperly executed by the previous administration because they contained the unauthorized signature of Charles Broussard (Broussard), who was not a Board member at the time the certificates were issued. By letter dated November 13, 1992, Tucker informed Fitzgerald that her certificate had been issued in error, that she was required to return it at once, and that a *1284 replacement would be delivered as soon as possible. In two subsequent letters, one dated December 2, 1992 to Fitzgerald's attorney and the other dated January 27, 1993 to Fitzgerald, Tucker assured that the old certificate would be destroyed upon its return. Fitzgerald received a new certificate in January of 1993, and the Board acknowledged receipt of her old certificate in February of 1993. However, her old certificate was not destroyed, but remained in the reception area of the Board's office.
On June 11, 1993, KLFY Channel 10 in Lafayette broadcast an interview with Tucker about deficiencies in the Board's financial and administrative management, which Channel 10 learned of through a publication that was released in June of 1993 by the Office of the Legislative Auditor, covering the Board's two-year activities, ending June 30, 1992. The legislative audit followed Tucker's telephone contact with the district attorney about unsigned board minutes and his meetings with the Department of Health and Hospitals and his contact with the legislative auditor about missing Board records.
During the broadcast, the interviewer, Charles Huebner (Huebner), inquired about the various findings of that publication, including its report of the Board's inability to account for previously issued board certificates, documenting state licensure by substance abuse counselors. As the discussion regarding the certificates progressed, Tucker was shown, holding up Fitzgerald's certificate, which clearly showed her name. Tucker later agreed with Huebner's suggestion that "bogus" certificates could enable someone to "masquerade" as a licensed substance abuse counselor.
The week after the broadcast, eight of Fitzgerald's nine patients left her service, and the ninth was referred to another counselor. She then filed suit on June 23, 1993, alleging a cause of action for defamation, tortious interference with her contract with the state, intentional infliction of emotional distress and a violation of civil rights. She initially named both Tucker and his wife as defendants. However, the suit against Mrs. Tucker was settled and dismissed. The petition was subsequently amended to include the State of Louisiana, Department of Health and Hospitals as a defendant, since Tucker was acting on behalf of the state board.
Fitzgerald continued to work at UMC until November of 1993, at which time her appointment to the position ended. She and her husband, D.S. "Terry" Fitzgerald, then moved to Texas. He confirmed that the controversy regarding Fitzgerald's certificate and employment at the board were significant factors in the couple's decision to relocate. While in Texas, Fitzgerald did not practice as a substance abuse counselor.
When Fitzgerald's certification came up for renewal in 1994, she mailed her recertification packet to the Board. However, by letter dated June 15, 1994 from Tony Wickramsekera, the vice-chairman of the certification committee, her application was deemed insufficient, although she was eventually recertified. It was later revealed that the rejection letter was drafted by Tucker, who was not on the Board at this time, but was serving as a consultant to the Board during its relocation to Baton Rouge, Louisiana.
Fitzgerald and her husband returned to Louisiana in July of 1994, but Fitzgerald did not immediately return to counseling; rather, she took a lower paying teaching position. Fitzgerald testified that she could not yet return to counseling because she was still too upset by the problems Tucker had created. She eventually resumed her private practice as a counselor.
After a four-day trial on January 23, 24, 25, and 28, 1997, the emotional distress claim was abandoned, and on Tucker's motion for directed verdict, the civil rights claim was dismissed. As to Fitzgerald's other claims, the jury unanimously awarded her $50,000.00 for defamation and $56,600.00 plus legal interest for the contractual interference. Judgment was signed to that effect on February 24, 1997. Tucker suspensively appeals.

ASSIGNMENT OF ERROR
Tucker asserts the following errors on appeal:
1. The jury erred in finding that he defamed Fitzgerald during the interview *1285 aired June 11, 1993 on KLFY Channel 10.
2. Notwithstanding assignment of error number one, the damages awarded Fitzgerald for defamation were excessive and not supported by the record.
3. The trial court erred, as a matter of law, in failing to grant his motion for directed verdict, dismissing Fitzgerald's claim for tortious interference with contract.
4. The jury erred in law and in fact, in awarding Fitzgerald damages based on claims of tortious interference with contract.

LAW

DEFAMATION
The Louisiana Supreme Court opined that the following are required to prove defamation: "Five elements are necessary to establish a defamation cause of action: (1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury." Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196, 198 (La. 1980).
"A defamatory communication is one that tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Sassone v. Elder, 626 So.2d 345, 352 (La.1993), citing RESTATEMENT (SECOND) OF TORTS § 559 cmt. e (1977). In her recitation of the facts, Fitzgerald lists eighteen retaliatory acts committed by Tucker. If proven, any one defamatory act would support the jury's award of damages to Fitzgerald.

Defamatory Words, Publication and Falsity
The existence of defamatory words, publication and falsity are clearly evident in this case. Tucker uttered numerous untrue statements about Fitzgerald to other individuals, regarding, among other things, her credentials as a board-certified counselor. He also defamed her during a televised interview with a local news reporter. During the course of the interview, Tucker gave the false impression that Fitzgerald was unqualified in her profession, thereby lowering her esteem in the community, even though he knew she had been reissued a bona fide certificate.

Malice
A person acts with malice if the publication was made with knowledge that the statement was false or with reckless disregard for its truth. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Malice can be implied, presumed from the falsity of the statements, or the plaintiff may be required to show actual malice. To determine the appropriate malice requirement, it is first necessary to determine if Fitzgerald should be classified as a public official or public figure.
To require Fitzgerald to prove actual malice, she must be a public official or a public figure. The public's perception of the authority of the individual is an important factor when deciding if a government employee is a public official. "Public official designation, for purposes of a defamation claim, applies at the very least to those among the hierarchy of governmental employees who have, or appear to the public to have, substantial responsibility for or control over conduct of government affairs." Landrum v. Bd. of Com'rs of the Orleans Levee Dist., 95-1591 (La.App. 4 Cir. 11/27/96); 685 So.2d 382, 391 citing Rosenblatt v. Baer, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). All government employees are not public officials. Fitzgerald served as the Administrative Director of the Louisiana State Board for Certification of Substance Abuse Counselors. During her four month tenure, she was the sole employee in the office. Her duties included typing, answering the phone, assembling test packets, and paying bills for the Board. This was not a high level government position and would not be viewed by the public as a job which gave her great control over governmental affairs.
Although she was not a public official, Fitzgerald could still be required to show actual malice if she were considered to be a public figure. If Fitzgerald had sought public attention or had achieved notoriety because of her position with the Board, she might be a limited public figure. The Supreme *1286 Court addressed the issue of who is a public figure. Fitzgerald's exposure to the public eye would not rise to the level described by the Court. "[T]hose classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Gertz v. Welch, Inc., 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Since she did not seek publicity and this controversy was not of interest to the general public, Fitzgerald would not be required to meet the same burden of proof as a public figure. The only publicity Fitzgerald ever received was the momentary view of her certificate on the local news. The inescapable conclusion is that Fitzgerald was a private citizen and should not be required to prove that Tucker acted with actual malice when he defamed her.
Because Fitzgerald is a private citizen, malice would be implied if she proved that the statements Tucker made were false. All of the statements which Tucker made about Fitzgerald's certificate being invalid were untrue. Her certificate contained the signature of a board member whose term had expired. This was a purely administrative error. The validity of her certificate was never in doubt. The statements Tucker made on television were speculative. There was no evidence that any bogus certificates were allowing people to masquerade as counselors.
The least burdensome malice requirement for Fitzgerald is that of defamation per se. If Tucker's behavior is defamatory per se, both malice and falsity are presumed. Due to the presumption, the burden shifts to Tucker, who would have to prove that the words were not false or that he did not act maliciously. In Elmer v. Coplin, 485 So.2d 171, 176-77 (La.App. 2 Cir.1986), the second circuit wrote,
Words are defamatory when they have a tendency to deprive a person of the benefits of public confidence or injure him in his occupation or have a natural tendency to injure the person's reputation. When the words themselves have those results, even without considering extrinsic facts and surrounding circumstances, they are defamatory per se. Cashio v. Holt, 425 So.2d 820 (La.App. 5 Cir.1982). Words which impute a crime to another are defamatory per se. Cangelosi v. Schwegmann Bros. Etc., supra. So are words that tend to adversely affect the person's business or profession. Wiel v. Israel, 42 La.Ann. 995, 8 So. 826 (1890).
The record clearly indicates that the defamation adversely affected Fitzgerald's business. The week after the television news broadcast, eight of her nine patients quit seeing her. Testimony from an area counselor established the lost employment opportunities she suffered. Because of this, there was no need for Fitzgerald to establish the malice element. It was Tucker's burden to overcome the presumption that he acted with malice. Elmer, 485 So.2d 171.
Notwithstanding, the trial court gave these jury instructions regarding malice: "Plaintiff must prove by a[sic] clear and convincing evidence that defendant acted with malice, which means that the defendant uttered, spoke, wrote the words about plaintiff with knowledge of their falsity, or in reckless disregard of their truth." These instructions placed a higher burden on Fitzgerald than the law requires. Fitzgerald should have either (1) been allowed to imply malice from the falsity of the statements; or (2) had the benefit of a jury instruction on the presumed malice and falsity of defamation per se. Even with the jury instruction, requiring a higher burden of proof on Fitzgerald's part, the jury found in her favor. Therefore, the erroneous jury instruction was harmless error.

Resulting Injury
The record is also clear that Tucker's actions damaged Fitzgerald's reputation. Following the televised broadcast, her private counseling practice deteriorated. Almost all of her patients left her service, and she did not receive any new referrals from health care professionals. In addition, her reputation in the professional community was harmed. For example, James F. Baham (Baham), an administrator for a rehabilitation center employing substance abuse counselors, *1287 testified that he had considered Fitzgerald for a position, but did not hire her and could no longer consider referring clients to her because of the controversy over her credentials. When asked on direct examination, "What, if anything, ever cast a cloud on Ann Fitzgerald's reputation to you?" Baham responded, "Well, I had heard thatthat Ann's credentials were being questioned and that there may also have been some legal problems surrounding her employment with the State Board." Further, when asked on cross-examination about the controversy in the professional community, he testified, "After reading the article, and then talking to people, it appeared that there was more than justthat there was more than just a question of the validity of the certificate that was in question. There seemed to almost be some vindictiveness or mean-spiritedness involved." In addition, when Bonnette, Fitzgerald's co-worker, was asked if "there were discussions around the hospital ... as to why the defendant held up Ann's certificate?" he responded, "Oh, there was endless discussion, yes."
The severe emotional toll that Tucker's defamation took on Fitzgerald is also evident. Mr. Fitzgerald testified that his wife cried, was a "basket case," and even talked of killing herself. Her supervisor, Fox, testified that she was often upset about the problems created by Tucker's statements. Fitzgerald testified as to her reaction to Tucker's defamation: "I was terrified. I was terrified, I felt shame. I had been embarrassed in front of my supervisor. I just felt totally undone, defenseless, powerless." She stated that after the television broadcast, "My husband and I had been out of town, and when I got back there were so many messages on my machine that it wouldn't take any more... I felt attacked. I felt sad. I felt angry. I felt alone. I felt victimized." Mr. Fitzgerald testified that this incident "triggered everything that happened in March, you know" and his wife "almost go[t] catatonic. She was shaking, you know, and then justyou know, just withdraws." Moreover, after the initial rejection of Fitzgerald's renewal application, Mr. Fitzgerald testified that his wife became "obsessive" and "paranoid" about the situation once again.
Based on the above, we hold that Fitzgerald has satisfied all of the required elements of a defamation claim. There is no error in the jury's finding that Tucker defamed her.

TORTIOUS INTERFERENCE WITH CONTRACT
After finding that it was "more probable than not that Ann Lang Fitzgerald had a contract with University Medical Center which was canceled or terminated because of the malicious words or actions of Dr. Thomas Tucker[,]" the jury awarded $56,600.00 for interference with Fitzgerald's contract. Our review of the record, however, indicates that allowing this claim to go to the jury was legal error. The facts did not support this cause of action. The trial court should have granted Tucker's motion to dismiss this claim.
The Louisiana Supreme Court has set forth the elements of this cause of action:
For purposes of analysis, the action against a corporate officer for intentional and unjustified interference with contractual relations may be divided into separate elements: (1) the existence of a contract or a legally protected interest between plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 234 (La.1989). See also Guilbeaux v. Times of Acadiana, Inc., 96-360 (La.App. 3 Cir. 3/26/97); 693 So.2d 1183, writ denied, 97-1840 (La.10/17/97); 701 So.2d 1327.
In this matter, the trial court instructed the jury as follows:
Ann Lang Fitzgerald claims that Thomas C. Tucker intentionally interfered with Ann Lang Fitzgerald's contract with University Medical Center, and seeks damages. You may award damages to Ann Lang Fitzgerald only if you conclude from all of the evidence that more probably than *1288 not, there was a contract between Mrs. Fitzgerald and University Medical Center, that Thomas Tucker intentionally and willfully interfered with the contract, that the contract as a result thereafter failed, and that the interference was the cause of the failure of the contract, and finally, that Thomas Tucker was motivated by malice, or at least not by a significant interest of his own or of the Louisiana State Board for Certification of Substance Abuse Counselors.
Fitzgerald testified that she voluntarily left UMC at the end of her appointment. Soon thereafter, she and her husband moved to Texas for several months. Because Fitzgerald completed her contract with UMC, we find no contract with which Tucker interfered. In addition, we can find no breach, as the UMC was under no obligation to renew that contract with Fitzgerald nor does the record establish that Fitzgerald sought renewal. Absent any proof that Fitzgerald voluntarily left because she had some indication from UMC that her contract would not be renewed, she is not entitled to recovery under this cause of action. Thus, the trial court erred in allowing the jury to award damages under this cause of action.

Quantum
An award for defamation "can include injury to reputation, personal humiliation, embarrassment, and mental anguish and suffering." Lege v. White, 619 So.2d 190, 191 (La.App. 3 Cir.1993) (citation omitted). The injury to Fitzgerald's reputation and its impact on her state of mind is undeniable. It appears that as soon as one crisis had passed in Fitzgerald's life, Tucker instigated another one. Fitzgerald even sought counseling on this matter from her supervisor at UMC. Mr. Fitzgerald testified as to the hopelessness his wife felt, even after moving to Texas: "[S]he was really angry that Tom Tucker still had that much control over her professional life, even at this distance. Can't even move to Texas and get away from him." In sum, it is obvious that Tucker used his official power as the Board's chairman to engage in an unbelievably persistent pattern of wrath against Fitzgerald.
The jury awarded Fitzgerald $50,000.00 for defamation and $56,600.00 for tortious interference with a contract. We have found that Fitzgerald had no claim under the theory of tortious interference of contract. Nevertheless, the record demonstrates that she did suffer a loss of $56,600.00 in wages, by losing her clients and being forced to take a lower paying teaching job, due to Tucker's defamation, not accounted for in the jury's $50,000.00 award for defamation. Loss of income is compensable as part of a defamation claim in which it can be shown that the one defaming caused that injury. See generally, Trentecosta v. Beck, 96-2388 (La.10/21/97), 703 So.2d 552, on remand, 95-0096 (La.App. 4 Cir. 2/25/98), 714 So.2d 721. (The Louisiana Supreme Court upheld an award of loss of income in a defamation suit.) The jury properly found that Fitzgerald was entitled to these damages but erroneously labeled them as damages for tortious interference of contract. Accordingly, the defamation award is modified to include the monetary damages Fitzgerald suffered because of Tucker's actions. La.Code Civ.P art. 2164. Therefore, the defamation award is modified upwards to $106,600.00.

CONCLUSION
Based on the foregoing, the jury's award of $50,000.00 to Fitzgerald for defamation is affirmed and modified upwards to $106,600.00. Its award of $56,600.00 for tortious interference is reversed. Costs of this appeal are cast to the appellant.
AFFIRMED IN PART AS MODIFIED; AND REVERSED IN PART.
AMY, J., dissents and assigns reasons.
YELVERTON, J., dissents for the reasons assigned by AMY, J.
AMY, Judge, dissenting.
Because, in my view, the plaintiff failed to meet the requisite burden of proof for both the defamation and tortious interference with contract claims, I dissent. With regard to defamation, the difference in my viewpoint and that of the majority is twofold. First, I find that the trial court correctly instructed the jury as to a heightened burden of proof *1289 with regard to malice. Further, I conclude that, when the heightened standard is applied to the facts of this case, the jury erred in finding that the plaintiff satisfied the requisite burden of proof.
My reading of the record indicates that the plaintiff's central argument is that she was initially defamed when Thomas Tucker's wife told the plaintiff's co-workers at UMC that the plaintiff was about to be indicted due to the auditor's findings at the Board. The inference in this allegation is that Tucker, the new chairman at the Board, told his wife of this and, in turn, she had repeated this conversation to co-workers. At trial, Tucker and his wife both denied the occurrence of such a conversation. In addition to this alleged statement, the plaintiff complained of a history of actions by Tucker which, according to the plaintiff, demonstrate a pattern of intentional and harmful conduct.
As explained by the majority, a plaintiff must establish the following elements in order to recover for defamation:
Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Restatement (Second) of Torts § 558 (1977). Thus a plaintiff, in order to prevail in a defamation action, must prove "that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages." Sassone, 626 So.2d at 350.
Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97); 703 So.2d 552, 559.
The degree of "fault" to be proven by a plaintiff depends upon his or her status as a public or private individual. If the plaintiff is a private individual and the matter at issue is not of public concern, the plaintiff need only prove standard negligence. However, if the plaintiff is a public official, he or she must prove a higher degree of malice. See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Louisiana Supreme Court has explained the higher standard required of a public official as follows:
In order to recover damages for defamation under the New York Times standard, a plaintiff who is a public official must establish by clear and convincing evidence that the defamatory statement was made with actual malice, that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. at 279-80, 84 S.Ct. at 725-26. A public official plaintiff cannot recover for a defamatory statement relating to his or her official conduct, even if false, unless the public official proves actual malice by clear and convincing evidence. Kidder v. Anderson, 354 So.2d 1306, 1308 (La.1978). At the very least, the public official plaintiff must prove that the defendant published the false statement with a high degree of awareness of its probable falsity. Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 667, 109 S.Ct. 2678, 2686, 105 L.Ed.2d 562 (1989). Or the public official plaintiff must prove that "the defendant in fact entertained serious doubts as to the truth of the publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).
Even if a public official plaintiff demonstrates that a defendant was grossly negligent in publishing false statements, that showing is insufficient to prove that the defendant acted with reckless disregard for the truth. Masson v. New Yorker Magazine, Inc., 501 U.S. at 510, 111 S.Ct. at 2429. Instead, a public official must clearly prove that the defendant actually knew the published statements were false or that the defendant was highly aware that the statements were probably false.
Davis v. Borskey, 94-2399, p. 9-11 (La.9/5/95); 660 So.2d 17, 23 (footnote omitted)(emphasis added).
While the standard is clear with regard to a public official, the standard is not as clear if the plaintiff is a private figure involved in an issue of public concern. Although not delineating the degree of malice required, the *1290 Louisiana Supreme Court recently stated as follows in Trentecosta, 96-2388, p. 13; 703 So.2d at 560:
This court has never addressed the requisite degree of fault for an actionable statement that injures a private individual in a matter of public concern, deciding the Sassone case on the basis of defamatory meaning and not reaching that issue. However, a significant measure of fault with regard to the falsity of the statement clearly is required. Restatement (Second) of Torts § 580 cmt.c (1977).
(Emphasis added.)(Footnotes omitted.) However, as pointed out by Justice Johnson in her dissent in Trentecosta, the Louisiana Supreme Court has previously ruled that not only must a plaintiff bear a higher burden where a matter of public concern is involved, but that actual malice is required. In Romero v. Thomson Newspapers, Inc., 94-1105, p. 6-7 (La.1/17/95); 648 So.2d 866, 870 cert. denied, 515 U.S. 1131, 115 S.Ct. 2556, 132 L.Ed.2d 810 (1995), a case involving a media defendant, the supreme court stated that "[a] private figure plaintiff claiming defamation from a factual misstatement on a public issue cannot recover presumed or punitive damages without showing actual malice." Furthermore, in his concurrence in Romero, Justice Dennis found that "our state constitution incorporates the standard articulated by a plurality of the U.S. Supreme Court in Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), which applies the New York Times actual malice test to speech of public concern regardless of the status of the plaintiff. See Sassone, supra at 356 (concurring opinion)." Id. at p. 12-13; 648 So.2d at 871. Under either case, however, the plaintiff must prove something more than the type of fault required in a defamation suit where the plaintiff is a private figure and the subject is not of public concern.
The determination of where the plaintiff falls into these three categories is critical. Considering the context in which the allegedly defamatory actions were taken in the present matter, I do not find that the plaintiff was involved as a private figure. Rather, these statements and actions arose from her previous employment as Administrative Director with the Board. Although true that the plaintiff did not perform policy-making duties, she was responsible for the daily operation of the Board's office in Lafayette. Further, her tenure at the Board was during the time period investigated by the legislative auditor in a report revealing numerous deficiencies. Therefore, I cannot conclude that the plaintiff was solely a private figure with regard to these statements.
Since, in my opinion, the plaintiff was not involved in a private matter as a private individual, I find that the jury was properly instructed as to a heightened malice requirement. As noted in the majority opinion, the trial court read an actual malice instruction to the jury. He stated:
Plaintiff must prove by a[sic] clear and convincing evidence that defendant acted with malice, which means that the defendant uttered, spoke, wrote the words about plaintiff with knowledge of their falsity, or in reckless disregard of their truth.
In my view, this charge to the jury was correct. And whether a public official or a private individual involved in a matter of public concern, the record, in my opinion, demonstrates a failure to prove the requisite degree of malice.
Although the plaintiff presented evidence indicating that her reputation within the professional community suffered due to Tucker's alleged statement, I find the context in which the statement arose to be important in the consideration of the question of actual malice. The legislative auditor testified that the report issued by his office was turned over to both the district attorney and attorney general's offices due to the inadequacy of the records discovered at the Board during the auditing process. The record demonstrates deficiencies which, however marginal, involved the plaintiff during her tenure as Administrative Director with the Board. Further, although the plaintiff was only Administrative Director for one month of the two-year period examined in the audit, she was employed part-time with the Board for six months of the period. The extent of her role in the deficiencies described in the audit remains unclear.
*1291 In order to meet her burden of proof, the plaintiff had to present clear and convincing evidence that Tucker either had knowledge that she was not going to be indicted or that he made the statement with reckless disregard for whether the statement was true or not. See New York Times Co., 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. My review of the record does not reveal sufficient evidence to meet this substantial burden. This failure is particularly clear in light of the plaintiff's role, even if remote, in the operation of the Board and the possible involvement of the district attorney and attorney general. Furthermore, since this statement was allegedly communicated by his wife and both denied that such a statement was made, the exact nature of any comment by Tucker is difficult to determine.
While Tucker's alleged lack of restraint could be sufficient were a general standard of malice required, I do not find that such negligence rises to the level of a "reckless disregard for the truth" as is necessary when the plaintiff is a public official. Davis, 94-2399, p. 10; 660 So.2d at 23. There is little doubt that this statement either referred to the plaintiff in her capacity as a public official as she was working for a state agency and the possibility of malfeasance was at issue. In the least, the plaintiff can be seen as a private individual involved in a matter of public controversy, which requires something more than standard negligence. See Romero, 94-1105; 648 So.2d 866.
As for the news broadcast, the central focus of the majority review, I find that here too the plaintiff failed to prove malice on Tucker's part. While once again the plaintiff was damaged within her professional community, I do not conclude that the record permits the trier of fact to find that Tucker acted maliciously. I note that, in this instance, it seems clear that the plaintiff was defamed, not as a public official, but as a private individual involved in a matter of public concern, i.e., the validity of a state-issued certificate.
My review of the broadcast indicates that, while the plaintiff's name is clearly visible, there is no statement that her certificate is an example of a "bogus certificate." Although he could have acted more prudently, I can find no proof by the requisite standard of either falsity or malice in Tucker responding to the reporter's statement and making no clear reference to the plaintiff as the holder of a "bogus" certificate. Further, although apparently misunderstood by the plaintiff and fellow members of the substance abuse counseling community, the plaintiff's actual certification was never at issue. Rather, merely the physical representation of that certification, the actual certificate, was recalled. No false statement was ever made regarding this recall. Accordingly, I conclude that the jury was manifestly erroneous in finding that the plaintiff proved the essential elements in this respect.
With regard to the plaintiff's claim for tortious interference with her contract, I agree with the majority that the jury erred in finding that the plaintiff had sustained her burden of proof in this area. The record indicates that the plaintiff testified that she voluntarily left UMC at the end of her appointment. However, I do not agree with the majority's decision to award $56,000.00 in lost wages since, in my opinion, the plaintiff failed to prove defamation by the requisite measure necessary to sustain the claim.
Accordingly, I respectfully dissent.