728 So.2d 931 (1999)
Marian STEED, Plaintiff-Appellant,
v.
ST. PAUL'S UNITED METHODIST CHURCH, Defendants-Appellees.
United Services Automobile Association, Plaintiff-Appellee,
v.
Marian Steed, Defendant-Appellant.
Nos. 31,521-CA, 31,522-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1999.
Writ Denied May 7, 1999.
*935 House, Kingsmill, Riess & Seabolt by Barbara G. Haynie, New Orleans, Jack E. Carlisle, Jr., James Madison Woods, Shreveport, Counsel for Marian Steed.
Hudson, Potts & Bernstein by Gordon L. James, Mary A. Buffington, Monroe, Counsel for St. Paul's Methodist Church.
Crawford & Anzelmo by Brian E. Crawford, Monroe, Barkley & Thompson by Walter C. Thompson, Jan K. Frankowski, New Orleans, Counsel for Odell Simmons.
Theus, Grisham, Davis & Leigh by Phillip D. Myers, Monroe, Counsel for USAA.
Mayer, Smith & Roberts by Ben Marshall, Jr., Shreveport, Counsel for Louisiana Annual Conference of the United Methodist Church.
Before NORRIS, GASKINS and PEATROSS, JJ.
NORRIS, Chief Judge.
Marian Steed, the defendant in reconvention, appeals a jury verdict in favor of Reverend Odell Simmons in the sum of $90,000 for defamation. Rev. Simmons answers Steed's appeal and questions the adequacy of the award, and both he and Steed appeal the *936 trial judge's ruling that Steed's homeowner's policy, issued by United Services Automobile Association (USAA), did not cover the defamation claim and Steed appeals the ruling that USAA had no duty to defend her against the reconventional demand. Steed finally urges that Rev. Simmons's claim was premature and requests this court to notice exceptions of no cause of action and prescription on our own motion. For the reasons expressed, we affirm.

Facts and Procedural History
Marian Steed (Steed) was employed as choir director for St. Paul's United Methodist Church (St.Paul's) in April, 1991. As part of her job, every week she was required to attend a general staff meeting and a music meeting. The general staff meeting was on Tuesday, and the music meeting, originally on Mondays, was moved to Tuesday after the general meetings. Attending the general meetings were various members of the staff, including Rev. Simmons and Steed, and attending the music meetings were Rev. Simmons, Steed, and the organist, Angie Patton.
According to Steed, shortly after she came to work Rev. Simmons started hugging her. She testified that at first the hugs seemed innocent, but soon became lingering and made her uncomfortable. Steed reported that the hugs started in his office and would normally occur after staff meetings. Steed stated that she wanted to give him the benefit of the doubt and at first did not think anything was wrong. Steed testified that in June, Rev. Simmons came into the choir room and seemed visibly upset. She asked him what was wrong, and when he did not answer her, she put her hands on his shoulders and asked again. According to Steed, Rev. Simmons then grabbed her around the waist, pulled her close to him, and tried to kiss her on her lips. She reportedly turned her head, at which time he kissed her hard on the cheek. She tried to pull away, and he let her go when he heard Ms. Patton coming into the room. Later, he asked if Steed thought Ms. Patton had seen them; Steed replied no, and told him never to touch her again.
Additionally, Steed testified that there were times when Rev. Simmons attempted to grab or touch her in the hall, in the sanctuary, and near the door of the foyer. Steed stated that on numerous occasions Rev. Simmons would tell her not to tell anyone about the incidents, or quiz her about whom she had told. When asking these questions, Rev. Simmons would either grab her by the arm or block her exit from the office. Steed reported that she told her husband, A.W., and then told Rev. Simmons that A.W. knew, and if he did not stop touching her and talking about the incidents, she would tell his wife, the district superintendent, and the Bishop. She states that she told him if he would quit talking about it, she would let the matter drop.
Steed testified that Rev. Simmons continued to badger her, so she told Ms. Patton and Margo Morgan, a member of the choir and the Pastor-Parish Relations Committee (PPR).[1] Steed then met with the chairman of the PPR, Chuck Casteel, Margo, and A.W. to discuss the situation. According to Steed, Mr. Casteel reported that Rev. Simmons, by his own admission, had "a thing going on" with her, and it was harmless.[2] Steed also testified that Morgan told her that Rev. Simmons had told her husband that he was having trouble "keeping a woman at bay." Notably, Morgan did not testify and Rev. Simmons denied making the comments.
Steed testified that the amorous touching, which started at the end of April 1991, ended mid-June 1991. Steed further testified that the grabbing and blocking of her exit from Rev. Simmons's office continued, and the retaliatory conduct on behalf of Rev. Simmons and the PPR ultimately resulted in her termination on May 31, 1992. Steed further testified that she was never asked out on a date, never asked to have sex, and never propositioned in any way.
Rev. Simmons testified that he first became aware of the accusations when Steed *937 was in his office and told him that she thought he was making a play for her. He testified that he closed the door, after asking her permission, and asked if she was joking. When told she was not, Rev. Simmons informed her that she was obviously misinterpreting his actions, and that he was a happily married man and was not interested in her in that way. Rev. Simmons reported that their next conversation was in the choir room; as he turned to leave he reached for her and she told him not to touch her. He later called her into his office; she again accused him of making a play for her and informed him that she had told her husband. Later that week, Rev. Simmons called A.W. to tell him that nothing had happened. A.W. testified that Rev. Simmons called to apologize for his actions. Rev. Simmons has steadfastly denied all allegations of wrongful conduct.
The PPR began discussing Steed's allegations on August 25, 1991, continuing into 1992, by which time a new chairman, Dr. John Cooksey, was in place. The PPR proposed various solutions to the problem, all of which were rejected by both Steed and Rev. Simmons. Steed would not accept any solution that did not involve counseling and a full acknowledgment by Rev. Simmons of his guilt before the PPR, while Rev. Simmons refused to attend any counseling or admit to anything as he steadfastly protested his innocence. During this time the congregation had heard about the accusations and rumors were being spread. In an attempt to defuse the rumors, the PPR read a statement to the congregation to the effect that Steed had made allegations against Rev. Simmons, that the PPR had conducted an investigation, and that there was no factual support for the allegations.
Steed then filed an internal complaint with Phil Woodman, the district superintendent,[3] who directed the complaint to the Joint Review Committee.[4] She later withdrew her complaint, because, according to her, she was not allowed to have an attorney present or to call witnesses. Woodman, however, proceeded with Steed's complaint, and the Board of Ordained Ministers issued a statement to the bishop that Rev. Simmons had been exonerated, the complaint was resolved and reconciliation had been achieved.
After these allegations, attendance, membership, and financial support to the church drastically declined. Bishop Oden testified, through deposition, that because of this turmoil, which he attributed to the sexual harassment allegations, Rev. Simmons's spending, and the PPR's decision to hire minsters' wives to work on the church staff, he decided, with the cabinet's approval, to transfer Rev. Simmons. The Bishop then asked Rev. Blakeman to take over St. Paul's; he agreed to do so, on the condition that he could hire his own staff. Consequently, the PPR terminated the entire staff, many of whom were then rehired by Rev. Blakeman. Steed was not rehired; she concedes that she did not reapply and refused to go to the church for an interview. Several PPR members testified that Rev. Simmons had nothing to do with the termination of Steed, or the other members of the staff.
In May 1993, Steed filed the instant suit against St. Paul's United Methodist Church, the Louisiana Annual Conference of the United Methodist Church, Rev. Simmons, and the United Methodist Church, Monroe District for discrimination in employment in violation of Title VII of the Civil Rights Act, sex discrimination and retaliatory discharge pursuant to La. R.S. 51:2231, et seq., and tort claims of intentional infliction of emotional distress and ruining her reputation. In June of 1993, Steed initiated an interview to air her charges. This was subsequently broadcast over two television stations in Shreveport and one in Monroe, and published in a Shreveport newspaper. Almost a year later, on March 16, 1994, Rev. Simmons filed a reconventional demand against Steed for defamation, and later amended his suit to include her insurer, USAA.
*938 The district court, in various pre-trial rulings, found that all of Steed's tort claims had prescribed and dismissed the Louisiana Annual Conference because it was not Steed's employer as defined by the state and federal sexual discrimination statutes. The matter then went to jury trial, during which the district court dismissed the federal claims against St. Paul's and Rev. Simmons because St. Paul's did not have the requisite number of employees; dismissed the state claims against Rev. Simmons because the statute did not allow Steed to sue him individually; and granted USAA's motions for partial summary judgment and directed verdict upholding its intentional act exclusion and finding no duty to defend Steed in the defamation claim. The sole remaining claims for the jury were whether St. Paul's was liable under Louisiana employment discrimination law and the merits of Rev. Simmons's defamation claim. The jury rejected Steed's discrimination suit and found her liable on the reconventional demand for defamation. The jury awarded Rev. Simmons a lump sum of $90,000.
Steed has appealed, specifically contesting the propriety of the "concurrent trial" on the principal and reconventional demands, the finding that she committed defamation, and the quantum. Rev. Simmons has answered, also challenging the quantum. Both of these parties have appealed the dismissal of USAA on the intentional act exclusion in the policy; Steed has further appealed the directed verdict that USAA owed no duty to defend the reconventional demand. Notably, Steed has not assigned as error the rejection of any of her principal demands, but she argues in brief that the verdict is wrong and she is entitled to a new trial of her claims against St. Paul's and Rev. Simmons's reconventional demand.
As noted, Steed does not contend by assignment of error that the jury was plainly wrong to reject her tort claims against St. Paul's, only that she is generally entitled to a new trial. Because she did not assign as error the judgment in favor of St. Paul's, the church contends that its liability is not properly before the court. The scope of review is limited to issues submitted to the trial court and contained in the assignments of error, unless the interest of justice clearly requires otherwise. URCA Rules 1-3, 2.12.4. Because of Steed's failure to assign and argue any error with respect to the St. Paul's verdict, and because the judgment is in other respects affirmed, we agree that this issue has not been properly preserved for appeal.

Discussion: Concurrent trial
Steed's first assignment of error challenges the procedure whereby Rev. Simmons's reconventional demand for defamation was tried before her principal demand (State discrimination claim) was concluded. She argues that an action for defamation involving allegations made in judicial pleadings against a party to those proceedings cannot be brought until those proceedings are terminated. Calvert v. Simon, 311 So.2d 13 (La.App. 2d Cir.1975), and citations therein. Steed concedes that she did not file an exception of prematurity, but only alleged it as an affirmative defense to the reconventional demand; and further concedes that she did not file any exception of no cause of action, but only suggested it in oral argument to this court, asking us to raise it on our own motion. We therefore will address the issues of the exceptions first.
The exception of prematurity is a dilatory exception intended to retard the progress of the action, not to defeat it. La. C.C.P. arts. 923, 926. A suit is premature if it is brought before the right to enforce the claim sued on has accrued. Clark v. City of Shreveport, 26,638 (La.App.2d Cir.5/10/95), 655 So.2d 617. The exception of prematurity raises the issue of whether the judicial cause of action has yet come into existence because some prerequisite condition has not been fulfilled. Jones v. Hartford Ins. Co., 560 So.2d 442 (La.1990); Weldon v. Republic Bank, 414 So.2d 1361 (La.App. 2d Cir.1982). Prematurity does not defeat the action or the court's jurisdiction. Jones v. Hartford Ins. Co., supra. Prematurity, like the other dilatory exceptions, is waived unless pled. La. C.C.P. art. 926 B; Jones v. Hartford Ins. Co., supra. The exception of prematurity must be tried before trial of the case. La. C.C.P. art. 929 A. Failure of the party urging the exception to insist upon a hearing and ruling, *939 like the failure to file the exception, is deemed a waiver of the argument. Shear v. Shear, 96-934 (La.App. 5th Cir. 5/28/97), 695 So.2d 1026, writ denied 97-2138 (La.11/14/97), 703 So.2d 632; Century Pools Inc. v. Pinkstaff, 598 So.2d 1189 (La.App. 5th Cir.1992).
By contrast, the exception of no cause of action is a peremptory exception intended to test the legal sufficiency of the petition. La. C.C.P. art. 927; Roberts v. Sewerage Water Bd. of New Orleans, 92-2048 (La.3/21/94), 634 So.2d 341. It is tried only on the face of the pleadings; generally, it must be overruled unless the allegations in petition exclude every reasonable hypothesis other than the premise on which the defense is based, i.e., unless the plaintiff has no cause of action under any evidence admissible under the pleadings. Id.; Haskins v. Clary, 346 So.2d 193 (La.1977). Every reasonable interpretation must be accorded the allegations in favor of maintaining the sufficiency of the petition. Jarrell v. Carter, 577 So.2d 120 (La.App. 1st Cir.), writ denied 582 So.2d 1311 (1991).
Every pleading is construed so as to do substantial justice. La. C.C.P. art. 865. The caption of the pleading does not control; the court is obligated to determine the substance of the pleading. Smith v. Cajun Insulation Inc., 392 So.2d 398 (La.1980); Banks v. Rattler, 426 So.2d 362 (La.App. 2d Cir.1983).
The thrust of Steed's argument is that Rev. Simmons's reconventional demand for defamation was premature until her own principal claim for employment and sexual discrimination was terminated. She concedes, however, that she did not file an exception of prematurity in the District Court. This is, of course, a waiver of the objection. La. C.C.P. art. 926. She further argues that she raised the exception as an affirmative defense in her answer. Under the mandate of art. 865, we have therefore construed her answer as a dilatory exception of prematurity. However, she made no effort to try the prematurity issue prior to the trial and never raised the issue during the nine-day trial. Under the circumstances we are constrained to find that Steed, through her failure to present the issue, has waived the objection of prematurity.
In brief Steed relies on the black-letter law that the claim of defamation cannot be tried until the other proceeding, in which the defamatory words were published, has been terminated. Calvert v. Simon, supra, and citations therein. We note, however, that in all of these reported cases, the exception of prematurity was filed and submitted for decision before the termination of the prior lawsuit. We are unaware of any defamation defendant who has allowed the case to proceed against her before her own lawsuit against her accuser has been resolved. Thus we adhere to the general rule that if the defendant fails to assert prematurity, the defamation claim may validly proceed to trial before her own suit has been concluded. See, e.g., Jones v. Hartford Ins. Co., supra.
Steed next argues that even if the exception of prematurity was waived, the defamation action was invalid because it failed to state a cause of action. She concedes that she never filed such an exception, but mentioned it to this court in oral argument, with the reminder that the court may supply the exception of no cause. La. C.C.P. art. 927 B. We also note that at least one court has dismissed a premature defamation suit on the ostensible grounds of no cause. Joiner v. Wilson, 377 So.2d 583 (La.App. 3d Cir. 1979).
Again, we are obligated to construe the exception by its substance, not the title supplied by the litigant. La. C.C.P. art. 865. Steed's argument cannot be possibly construed as denying the legal sufficiency of Rev. Simmons's reconventional demand; her only genuine claim is prematurity. For the reasons already discussed, prematurity was waived.
Admittedly, the appellate court may supply an exception of no cause ex proprio motu. La. C.C.P. art. 927 B. After close consideration, however, we perceive nothing in the procedural history of this case, or in the evidence, to warrant such an exercise of our discretion. In the first place, the true import of the exception is prematurity, *940 which was waived. Second, Steed never challenged the legal sufficiency of Rev. Simmons's claim prior to or during trial and did not file an exception with this court or brief the issue, raising it only by way of asking this court to notice it on our own motion; we are loath to supply an extraordinary remedy without argument from the opponent or a ruling by the trial court. Finally, Steed has not even challenged the dismissal of her discrimination claims as manifestly erroneous; under the circumstances we decline to supply the exception of no cause of action on our own motion. There is no showing of prejudice.
In sum, the claim of prematurity was alleged by means of affirmative defense but then waived. The belated claim of no cause lacks merit. Because of Steed's failure to pursue prematurity, the District Court did not err in holding concurrent trial of the principal and reconventional demands. This assignment of error lacks merit.

Defamation
In reviewing a trial court's findings of fact, a court of appeal may not set aside the trial court's judgment in the absence of "manifest error" or unless the trial court was "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). The trial court is not "manifestly erroneous" or "clearly wrong" if the factfinder comes to a reasonable conclusion. Stobart v. State, 617 So.2d 880 (La.1993). If conflicts exist in the testimony and the trial court made "reasonable evaluations of credibility and reasonable inferences of fact," then the appellate court should not disturb the judgment even if it feels its "own evaluations and inferences are more reasonable." Id.
To prevail in an action for defamation, the plaintiff must prove: defamatory words, publication, falsity, malice (actual or implied), and resulting injury. Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196 (La.1980); Elmer v. Coplin, 485 So.2d 171 (La.App. 2d Cir.), writ denied 489 So.2d 246 (1986).[5] Defamatory words are those which harm the reputation of another "so as to lower him in the estimation of the community or to deter others from associating with him." Elmer v. Coplin, supra. Malice is the lack of reasonable belief in the truth of the words. Bell v. Rogers, 29,757 (La.App.2d Cir.8/20/97), 698 So.2d 749. However, when words expressly or implicitly accuse the plaintiff of criminal conduct, the words are considered defamatory per se. Elmer v. Coplin, supra. When words are defamatory per se, the elements of falsity and malice are presumed, although this presumption may be rebutted by the defendant. Id. Damages from defamation are not confined to pecuniary losses; harm to the plaintiff's reputation will support an award. Lemeshewsky v. Dumaine, 464 So.2d 973 (La.App. 4th Cir.1985).
We note at the outset that without objection from Steed, the District Court instructed the jury that her words were defamatory per se. R.p. 913. The failure to object to this charge waives any objection thereto. La. C.C.P. art. 1793 C. Even so, the record amply supports the finding that Steed's words were defamatory. Rev. Simmons's reputation was diminished to the point that he was transferred from St. Paul's, and in fact relocated in the Southeast portion of the State, an extraordinary move necessary to distance him from the scandal. A rational juror could find, more probably than not, that his reputation, and his ability to serve as a minister in North Louisiana, were damaged by Steed's accusations. Moreover, Steed's charges that Rev. Simmons grabbed her, tried to kiss her, and physically blocked her from leaving his office, amount to accusations of at least simple battery, La. R.S. 14:35. Additionally, by accusing him of sexual harassment, Steed launched allegations which by their nature tended to injure his *941 personal and professional reputation. Elmer v. Coplin, supra. Even though the per se defamation created a presumption of malice, this element was shown by Steed's own testimony. She admitted in court that when she told the television reporters that Rev. Simmons grabbed her thigh, she was incorrect. In fact, the general absence of evidence to support her allegations could persuade a rational juror that Steed had no reasonable belief that her statements were true. Finally, the element of publication is not seriously contested. Steed admitted reporting Rev. Simmons's acts to Margo, Mr. Casteel, Mr. Woodman, members of the PPR, members of the congregation, and her husband; she wrote and republished a letter detailing her accusations; she granted a TV interview which aired on two stations in Shreveport, one in Monroe, and in a Shreveport newspaper.
In summary, the evidence will support a rational juror's finding that Rev. Simmons proved every essential element of his claim of defamation against Steed. The jury was also not plainly wrong to find that she failed to overcome the presumption of falsity and malice.
Steed further contends, however, that her statements were privileged. Privilege is one of the defenses to a defamation suit. Elmer v. Coplin, supra; John T. Cox Jr., Defamation: A Compendium, 28 La. L.Rev. 82 (1967). Certain statements are privileged, and can fall into two general classes: absolute or unqualified, and conditional or qualified. Elmer v. Coplin, supra; Albarado v. Abadie, 97-478 (La.App. 5th Cir. 11/12/97), 703 So.2d 736, writ denied 97-3081 (La.2/13/98), 709 So.2d 756. No absolute privilege is present in this case. Elmer v. Coplin, supra.[6] Steed alleged privilege as an affirmative defense, but did not argue it to the jury or request a jury charge on the issue. Since she argues this issue for the first time on appeal, it is deemed abandoned. See, Cadle Co. v. Dumesnil, 610 So.2d 1063 (La.App. 3d Cir.1992), writ denied 613 So.2d 992 (1993); Smith v. Boothe, 28,065 (La. App.2d Cir.2/28/96), 669 So.2d 682, writ denied 96-0821 (La.5/10/96), 672 So.2d 928; Tichenor v. Roman Catholic Church, 95-0930 (La.App. 4th Cir. 12/14/95), 665 So.2d 1307, writ denied 96-0183 (La.3/15/96), 669 So.2d 424. Even if the issue were properly presented, it would lack merit.
The first privilege claimed by Steed is the qualified privilege when a statement is made in good faith, on a subject matter in which the person communicating it has an interest or in reference to which he has a duty, to a person having a corresponding interest or duty. Elmer v. Coplin, supra. Good faith exists if the person making the statements had reasonable grounds for believing that the statements were true and he honestly believed them to be true. Zellinger v. Amalgamated, Clothing, 28,127 (La.Ap.2d Cir.4/3/96), 683 So.2d 726. The jurisprudence has repeatedly held that communications between appropriate persons "within the employer's walls," concerning allegations of conduct by an employee that bears on the employer's interest, are protected by this privilege if made in good faith. Martin v. Lincoln Gen'l Hosp., 588 So.2d 1329 (La.App. 2 Cir.1991), writ denied 592 So.2d 1302 (1992), and citations therein.
In essence, Steed contends that she made the statements in good faith, that she had an interest in reporting alleged sexual harassment, and that the people to whom she reported (members of the PPR and church grievance committee) had a duty to her as an employee and to the church to deal with ministers who engage in sexual harassment. However, with all the evidence in this record, the jury was not plainly wrong to conclude that Steed was not in good faith. There was conflicting testimony regarding whether or not any sexual harassment had occurred; notably, Steed admitted that her televised accusation was false. Rev. Simmons denied each *942 and every accusation. The jury was entitled to find the evidence of Rev. Simmons more credible, and that of Steed and her only corroborating witness, Levi Williams, less so.[7] In view of the conflicting evidence, this privilege does not apply.
Steed also contends that with regard to the televised interview she is protected by the Fair Reporting Privilege. This privilege was originally associated with the publication of legislative materials to the public. Cox, supra. It was later expanded to general publications, materials other than legislative, is normally associated with the press, and exists when the defendant publishes a fair and accurate account. Doe v. Doe, 941 F.2d 280 (5th Cir.1991). This privilege is defeated if the allegations are made with the knowledge that the information is false, or with reckless disregard for its truth value, or if the report is less than a "fair and true" account. Id. This privilege has been extended to entities other than the press, notably to police officers who make oral or written reports to pass on information to the general public. Trentecosta v. Beck, 96-2388 (La.10/21/97), 703 So.2d 552; see also Restatement (Second) of Torts § 611 (1977).
Steed obviously does not qualify as a party who makes reports to pass on information to the general public. She instigated an interview with TV reporters, in which she published statements which she later recanted as false. Her "report," which was actually a first-person accusation, was neither fair nor accurate and this privilege does not apply.
The jury was not manifestly erroneous in finding that Rev. Simmons proved every essential element of his defamation claim against Steed, and that Steed was not entitled to the conditional privileges claimed. The finding of liability is affirmed.

Quantum
Steed appeals the amount of damages, claiming that $90,000 was excessive. Rev. Simmons answers, contesting the adequacy of the award. The jury award was a lump sum, and did not distinguish special from general damages. As such, it is assumed that the lump sum included both special and general damages.
An award of damages in a defamation case is left to the great discretion of the jury and should not be disturbed absent a showing of manifest error. Garrett v. Kneass, 482 So.2d 876 (La.App. 2d Cir.), writ denied 484 So.2d 671 (1986); Lemeshewsky v. Dumaine, supra. Damages for defamation include both special damages and nonpecuniary or general damages. Henderson v. Guillory, 546 So.2d 244 (La.App. 2d Cir.), writ denied 551 So.2d 635 (1989); Bell v. Rogers, supra; Lege v. White, 619 So.2d 190 (La.App. 3d Cir.1993).
General damages may include injury to reputation, personal humiliation, embarrassment, mental anguish, anxiety and hurt feelings. Henderson v. Guillory, supra; Bell v. Rogers, supra; Lege v. White, supra. Damages for defamation in reported cases run from nominal to $150,000.[8] Additionally, loss of income is compensable as part of a defamation claim. Fitzgerald v. Tucker, 97-916 (La.App. 3d Cir.7/29/98), 715 So.2d 1281.
When issues not raised by pleadings are tried by express or implied consent of the parties, they shall be treated as if they had been raised by the pleadings. La. C.C.P. art. 1154. Rev. Simmons's reconventional demand alleged defamatory statements starting *943 in 1993, including the March 1993 publication of an earlier letter detailing Steed's allegations, the May 1993 false statements at a meeting, and the June 1993 televised interview. Though his pleadings were limited in time, he and others testified about defamatory statements starting in the summer of 1991. All evidence of Steed's defamatory statements was received without objection, indicating Steed's implied consent to the trial of these issues.
According to Rev. Simmons and Rev. Wynn, Rev. Simmons's reputation has suffered. Mr. Cooksey, Bishop Oden and Rev. Wynn testified that Rev. Simmons was transferred due, at least in part, to the accusations, and that he was sent to Slidell because there is a lack of communication between that area and the Shreveport/Monroe area. In sum, it was reasonable for the jury to find that Rev. Simmons's general reputation was injured by the allegations. Rev. Simmons testified that due to the transfer his salary was reduced by $18,000 per year. The record clearly shows that Rev. Simmons has suffered extreme embarrassment, humiliation, and loss of reputation from his fellow ministers and family, that he was transferred due in part to the accusations, and that he has suffered a loss of income due to the transfer. It was not manifestly erroneous for the jury to award Rev. Simmons a lump sum of $90,000 in damages for his loss of reputation, his embarrassment and humiliation, and his loss of income.

Intentional Act Exclusion
Both Steed and Rev. Simmons contest the district court's ruling that the intentional act exclusion in USAA's policy excluded coverage for the reconventional demand based on defamation arising from false allegations of sexual harassment and retaliatory discharge.[9] The policy expressly excludes coverage for "bodily injury or property damage ... expected or intended by the insured."
Summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, except those disallowed by law; the procedure is favored and must be construed to accomplish these ends. La. C.C.P. art. 966 A(2). After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted. Art. 966 C(1). The burden of proof remains with the mover. Art. 966 C(2). Appellate review of summary judgment is de novo, utilizing the same criteria that guide the trial court's grant of the judgment. Guillory v. Interstate Gas Station, 94-1767 (La.3/30/95), 653 So.2d 1152. Appellate courts should not rule on appeal after a full trial on the merits on the strength of the affidavits in support of a motion for summary judgment, but should review the entire record. Hopkins v. American Cyanamid Co., 95-1088 (La.1/16/96), 666 So.2d 615.
A directed verdict is proper when, after considering all evidence presented in the light most favorable to the moving party's opponent, the facts and inferences are so overwhelmingly in favor of a verdict for the movant that the court believes reasonable men could not have arrived at a contrary conclusion. Collins v. Whitaker, 29,324 (La.App.2d Cir.4/2/97), 691 So.2d 820. The standard of review of the trial judge's grant of a directed verdict is whether, viewing the evidence submitted, reasonable men could not reach a contrary verdict. Id.; Babb v. Boney, 30,443 (La.App.2d Cir.4/8/98), 710 So.2d 1132. In addition, the appellate court must evaluate the propriety of a directed verdict in light of the substantive law related to the claims. Collins v. Whitaker, supra.
Insurance policies should be construed to effect, not deny, coverage. Great American Ins. Co. v. Gaspard, 608 So.2d 981 (La.1992); Breland v. Schilling, 550 So.2d 609 (La.1989). An exclusion from coverage should be narrowly construed. Id. The phrase "bodily injury ... which is expected or intended" emphasizes that an excluded injury is one which the insured intended, *944 not one which the insured caused, however intentional the injury-producing act. Id.; Menard v. Zeno, 558 So.2d 744 (La.App. 3d Cir.), writ denied 561 So.2d 121 (1990). Not all injuries from an intended act will be excluded, only those injures which were intended. Id. An act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur. Id. In determining if the act is intended, the court looks at the subjective intention and expectation of the insured. Id.
Steed made allegations that Rev. Simmons, a married minister, was sexually harassing her. She repeated these allegations to various members of the congregation, reported them to Rev. Simmons's supervisors, and instituted an interview which led to the airing of these allegations over two television stations in Shreveport, one in Monroe, and a newspaper in Shreveport. Notably, when St. Paul's PPR attempted to resolve this situation, Steed refused to accept any solution which did not include Rev. Simmons attending counseling and admitting to the PPR that he had sexually harassed her. Additionally, when asked about these statements Steed testified that she intended to accuse Rev. Simmons of sexual harassment and that she was aware that his reputation would suffer. In sum, by making and repeating allegations of sexual harassment against a Methodist minister, Steed either knew that Rev. Simmons would suffer humiliation, loss of reputation, and a job transfer, or was substantially certain that these damages would follow. As such, she intended the accusations and the injuries; thus, the intentional act exclusion in her homeowner's policy applies. The trial court's rulings on the intentional act exclusion was not erroneous.

Duty to Defend
Steed finally appeals the directed verdict in favor of USAA finding no duty to defend in the defamation claim brought against her. The USAA policy provides that "[i]f a claim is made or a suit is brought against an insured for damages because of bodily injury or property damaged caused by an occurrence to which coverage applies we will ... provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent."
USAA filed a motion for summary judgment contesting the existence of a duty to defend; the motion was denied. Our review of the record reveals that Mr. Carlisle, on behalf of USAA, represented Steed on the defamation claim. He filed a second answer on her behalf in addition to the initial one filed by Mr. Woods; was present during the entire proceeding, even after directed verdict finding no duty to defend the reconventional demand; and was present when the judgment was rendered. Steed made no showing that USAA did not provide her with a defense at the trial and never raised the issue until appeal, and then only through conclusory allegations. In sum, the record refutes Steed's factual claim and the legal issue of USAA's duty to defend is moot. This assignment of error is meritless.

Conclusion
For the reasons expressed, we affirm the jury's verdict of defamation and award of $90,000 to Rev. Simmons. We also affirm the trial court's directed verdict and summary judgment in favor of USAA on the policy exclusion and find that the issue of the duty to defend is moot since USAA did provide Steed with a defense to the reconventional demand. Finally, we reject Steed's exception of prematurity as untimely and waived, and decline to notice on our own motion any failure of Rev. Simmons to state a cause of action. Cost of appeal assessed to Steed.
AFFIRMED.
NOTES
[1] The PPR consists of volunteer lay members of the church and is the governing board of the church.
[2] Mr. Casteel denied that Rev. Simmons ever made that statement to him.
[3] The Methodist churches in Louisiana are broken up into 9 districts, each having a district superintendent in charge. The 9 superintendents and the bishop make up the cabinet which in turn assigns ministers to various churches.
[4] The Joint Review Committee directed the complaint to the Board of Ordained Ministers, which is comprised of ministers and is the first step in filing a grievance within the Methodist Church.
[5] At oral arguments, counsel for Steed stated that part of Rev. Simmons's reconventional demand had prescribed. This court will not consider that issue because, though prescription is a peremptory exception which can be raised at any stage prior to the submission of the case for a decision, La. C.C.P. art. 928, a court cannot, supply the exception of prescription on its own motion. La. C.C.P. art. 927. Prescription must be pled specifically, which was not done in the instant case. La. C.C.P. art. 927. Steed never filed an exception of prescription at either the trial court level or the appellate level.
[6] The absolute privileges include statements made by a legislature or a judge in the course of his official duties; statements made by a witness in a judicial proceeding or any other legal proceeding where the testimony may be required and the statement is reasonably believed by the witness to be relevant to the matter; and a privilege that an owner, licensee or operator of a visual or sound broadcast station or network has, when the statement is made or uttered over the station by one other than them.
[7] Levi had borrowed substantial amounts of money from the Steeds interest free and had purchased a car from them and instead of paying for it, worked it off through yard work.
[8] Moreau v. Brenan, 466 So.2d 572 (La.App. 5th Cir.1985) ($1,000); Bonnett v. Theriot, 491 So.2d 703 (La.App. 3d Cir.1986) ($2,500); Lege v. White, supra ($5,000); Melancon v. Hyatt Corporation, 589 So.2d 1186 (La.App. 4th Cir.1991), writ denied 592 So.2d 411 (1992) ($10,000); Wattigny v. Lambert, 408 So.2d 1126 (La.App. 3d Cir.), writ denied 410 So.2d 760 (1981), cert. denied, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982) ($15,000); Thomas v. Busby, 95-1147 (La.App. 3d Cir.3/6/96), 670 So.2d 603, writ granted for other reasons 96-0891 (La.5/17/96), 673 So.2d 601 ($25,000); Trentecosta v. Beck, 95-0096 (La.App. 4th Cir. 5/13/98), 714 So.2d 721 ($50,000); Fitzgerald v. Tucker, supra. ($50,000); McHale v. Lake Charles American Press, 390 So.2d 556 (La.App. 3d Cir.1980), cert. denied 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) ($150,000).
[9] USAA also argues that the policy excludes coverage pursuant to a business exclusion. Since we find that coverage is excluded pursuant to an intentional act exclusion, we pretermit the determination of whether the business exclusion applies in this case.